**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| DEBRA DARRINGTON as next friend for M.R.; ERIC MASSEY, as next friend for K.M.; ANITA TABB as next friend for M.T.; VEDA JOHNSON as next friend for O.J.; CARRIE MINER as next friend for C.T.; and DELICIA WALKER as next friend for D.W. on behalf of themselves and a class of similarly situated individuals, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MISSOURI DEPARTMENT OF MENTAL HEALTH; VALERIE HUHN, in her official capacity as Director of the Department of Mental Health; DR. MINA CHAREPOO, in their official capacity as member of the Missouri Mental Health Commission; DR. KISHORE KHOT, in their official capacity as member of the Missouri Mental Health Commission; BRIAN D. NEUNER, in their official capacity as member of the Missouri Mental Health Commission; LYNNE UNNERSTALL, in their official capacity as member of the Missouri Mental Health Commission; JHAN R. HURN, in their official capacity as member of the Missouri Mental Health Commission; DENNIS H. TESREAU, in their official capacity as member of the Missouri Mental Health Commission; TERESA E. COYAN, in their official capacity as member of the Missouri Mental Health Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs, on behalf of themselves and all others similarly situated, by and through the undersigned counsel and Plaintiffs' next friends, bring this class action under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and allege as follows:

1

## INTRODUCTION

1.     The State of Missouri is knowingly abrogating its legal duties to people detained pre-trial and living with serious mental illness. Missourians with mental health disabilities and other cognitive disabilities so severe that they are deemed incompetent to stand trial are languishing in jails for months, and, in some cases, even years—suffering detrimental and at times irreversible negative effects—waiting for the Missouri Department of Mental Health ("DMH") to provide court-ordered treatment.

2.     DMH is the state agency responsible for delivering services to people assessed to be not competent to stand trial due to mental health or cognitive disabilities.

3.     For years, DMH has been systemically failing to provide timely evaluations and restoration services to pretrial detainees who are suspected of, or adjudicated to be, incompetent to stand trial. DMH has stood by as the list of individuals waiting for DMH services steadily grew: in September 2021, 106 individuals were in jail waiting for DMH services. As of May 5, 2025, 230 people waited in jail to be evaluated by DMH, and another 430 individuals already deemed not competent to stand trial were detained in jails across the state waiting for treatment DMH has been court-ordered to provide. By October 2025, the number of people waiting for restoration treatment reached nearly 500—increasing by a factor of four in as many years. DMH is knowingly derelict in its duty to these hundreds of Missourians, all of whom suffer while abandoned in county jails, some decompensating beyond restoration.

4.     This lawsuit seeks declaratory and injunctive relief on behalf of two classes of individuals grievously harmed by this broken and backlogged system:

5.     All people who are now, or will be in the future, charged with a crime in Missouri state court and for whom a court has ordered or granted a request for a competency evaluation and who are: (a) currently detained in a county or city jail or similar facility, and (b) placed on a waitlist

2

for competency evaluation services by DMH but who have not received evaluation services within a constitutionally-acceptable time (the "Evaluation Class"); and

6.　　All people who are now, or will be in the future, charged with a crime in Missouri state court and are: (a) declared not competent to proceed to trial by the state court; (b) currently detained in a county or city jail or similar facility; (c) court-ordered to receive restoration services by DMH; and (d) awaiting, beyond a constitutionally acceptable time, court-ordered competency restoration services to be provided by DMH or its designees (the "Restoration Class").[1]

7.　　When DMH is ordered to evaluate a criminal defendant for competency, Missouri law explicitly requires DMH to conduct that evaluation within 60 days of a request unless there is good cause, as ordered by a court, to delay the evaluation. Mo. Rev. Stat. § 552.020.2.

8.　　In reality, class members routinely wait six months or more for a competency evaluation after an order has been entered and without an order indicating that there is any good cause for such a delay.

9.　　About half of the individuals assessed will be found incompetent to stand trial.

10.　　Missouri law requires DMH to take custody of the individual immediately upon entry of a commitment order following an evaluation resulting in a determination of incompetence, and due process requires this transfer to be completed within a reasonable time. Nonetheless, people already assessed to be incompetent are held on average 14 months in jail before receiving restoration treatment.

11.　　Some people deemed to be incompetent with misdemeanor or minor felony charges are being held in jail for longer than the maximum permissible sentence for their pending charge(s).

---

[1] Plaintiffs filed a motion for class certification contemporaneously herewith.

12.     As of the date of this filing, the named Plaintiffs have spent a combined 1,619 days behind bars waiting for DMH to provide court-ordered competency services. All the while, these individuals' criminal cases remain held in abeyance.

13.     This problem is pervasive, persistent, and worsening. DMH is fully aware of the extent of the problem, has alluded to the threat of litigation in public statements, and yet has failed to take reasonable steps to address the issue of unconstitutional wait times for DMH services.

14.     As a result, Missouri's jails have become de facto mental health wards, with terrible outcomes for both the mentally ill pretrial detainees and overwhelmed correctional staff and agencies. Indeed, responding to a mental health crisis with criminalization, and then ignoring the serious needs of people in the State's care and providing no meaningful treatment, does a disservice to all Missourians. Caged in county jails, which have neither the resources nor expertise to provide effective restoration treatment, Plaintiffs' and class members' mental health deteriorates while their criminal cases are suspended.

15.     Some class members are not aware of who they are or where they are. Some are so sick they are incapable of caring for themselves in the most basic ways and must be hospitalized— at cost to the county—to ensure they do not die in jail custody while awaiting DMH treatment. Sadly, one person died in jail custody while awaiting DMH services earlier this year.[2] Timothy Beckmann spent seven months in jail on the DMH waitlist before his death. In October 2023, Brooke Bailey died in Cooper County Jail, while on the DMH waitlist, after the Jail failed to

---

[2] *See*, *e.g.*, Clara Bates, *Man dies in Jackson County jail after waiting months for court-ordered mental health treatment*, MISSOURI INDEPENDENT, May 24, 2025, https://missouriindependent.com/2025/05/23/man-dies-in-kc-jail-after-waiting-months-for-court-ordered-mental-health-treatment/.

properly treat her diabetes.[3] According to news reports, at the time of her death, her clothing and the floor around her were covered in urine and vomit.[4]

16.     This lawsuit seeks injunctive and declaratory relief to stop this unconstitutional practice and prevent Defendants from harming Missouri's most vulnerable residents.

## JURISDICTION AND VENUE

17.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, which provides federal district courts original jurisdiction in civil actions arising under the U.S. Constitution and the laws of the United States, and 28 U.S.C. § 1343(a)(3), which provides federal district courts original jurisdiction in civil actions to redress the deprivation, under color of state law, of any right secured by the U.S. Constitution.

19.     The Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

20.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(g) and L.R. 3.1(a)(2) because substantial events at issue in this litigation occurred in the Western District of Missouri and in Cole County, Missouri.

---

[3] Ryan Pivoney, *Families of those waiting for mental health hospital beds call for action*, NEWS TRIBUNE, Jan. 14, 2024, https://www.newstribune.com/news/2024/jan/14/families-of-those-waiting-for-mental-health/

[4] Stephanie Southey & Avery Grosvenor, *Former Cooper County lieutenant, deputy charged with involuntary manslaughter in inmate's death*, KOMU, Feb. 29, 2024, https://www.komu.com/news/midmissourinews/former-cooper-county-lieutenant-deputy-charged-with-involuntary-manslaughter-in-inmates-death/article_042c74de-d737-11ee-999e-177960eda0f9.html (33-year-old woman died from "untreated diabetes" while waiting in Cooper County Jail on DMH waitlist).

## PARTIES

### *Debra Darrington and Plaintiff M.R.*

21.     Debra Darrington is a resident of Jackson County and is suing as M.R.'s next friend pursuant to Fed. R. Civ. P. 17(c).

22.     M.R. is 31 years old and is currently detained at the Jackson County detention center, where he has been held since April 11, 2024, in cause no. 2416-CR01701. On September 5, 2024, the Circuit Court entered an order finding M.R. incompetent to stand trial, suspending proceedings, and committing M.R. to the custody of the Director of DMH.

23.     Defendants have failed to take custody of M.R. and timely provide the restoration services required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, M.R. has been waiting **445 days** for restoration treatment.

24.     While M.R. languishes in jail on DMH's waitlist, his mental and emotional condition deteriorate.

### *Eric Massey and Plaintiff K.M.*

25.     Plaintiff Eric Massey is a resident of Buchanan County, Missouri, and is suing as K.M.'s next friend pursuant to Fed. R. Civ. P. 17(c).

26.     K.M. is 64 years old and is currently detained at the Buchanan County Jail, where he has been held since on or about June 7, 2024, in cause no. 24BU-CR01033. On January 24, 2025, the Circuit Court entered an order finding K.M. incompetent to stand trial, suspending proceedings, and remanding K.M. to the custody of the Director of DMH.

27.     Defendants have failed to take custody of K.M. and timely provide the restoration services required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, K.M. has been waiting **304 days** for restoration treatment.

6

28. While K.M. languishes in jail on DMH's waitlist, his mental and emotional condition deteriorate.

***Anita Tabb and Plaintiff M.T.***

29. Anita Tabb is a resident of St. Louis County, Missouri, and is suing as M.T.'s next friend pursuant to Fed. R. Civ. P. 17(c).

30. M.T. is 34 years old and is detained at the St. Louis County Justice Center where he has been held since April 26, 2024, on an assault charge in cause no. 24SL-CR02907-01. On July 22, 2025, the Circuit Court entered an order finding M.T. incompetent to stand trial, suspending proceedings, and committing M.T. to the custody of the Director of DMH.

31. Defendants have failed to take custody of M.T. and timely provide the restoration services required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, M.T. has been waiting **125 days** for restoration treatment.

32. While M.T. languishes in jail on DMH's waitlist, his mental and emotional condition deteriorate.

***Veda Johnson and Plaintiff O.J.***

33. Veda Johnson is a resident of the State of Nevada and is suing as O.J.'s next friend pursuant to Fed. R. Civ. P. 17(c).

34. O.J. is 34 years old and is currently detained at the Greene County Justice Center and on a waitlist for DMH services, where he has been held since October 16, 2023, in cause no. 2331-CR03278. On or about January 3, 2024, the Circuit Court entered an order finding O.J. incompetent to stand trial, suspending proceedings, and committing O.J. to the custody of the Director of DMH.

35.     Defendants have failed to take custody of O.J. and timely provide the restoration services required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, O.J. has been waiting **472 days** for restoration treatment.

36.     While O.J. languishes in jail on DMH's waitlist, his mental and emotional condition deteriorate.

***Carrie Miner and Plaintiff C.T.***

37.     Carrie Miner is a resident of St. Charles County and is suing as C.T.'s next friend pursuant to Fed. R. Civ. P. 17(c).

38.     C.T. is white 31-year-old man and currently detained at the St. Louis City Justice Center on a waitlist for DMH services.

39.     C.T. was arrested on January 4, 2024, in cause no. 2422-cr00038. At his detention hearing the following day, the court ordered a competency evaluation. However, a competency report was not filed until March 5, 2025.

40.     On March 17, 2025, the Circuit Court entered an order finding C.T. IST, suspending proceedings, and committing C.T. to the custody of DMH. On September 2, 2025, DMH requested more time to provide treatment to C.T. due to waitlists at each of its facilities.

41.     Defendants have failed to take custody of C.T. and timely provide the restoration services required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, C.T. has been waiting **252 days** for restoration treatment.

42.     While C.T. languishes in jail on DMH's waitlist, his mental and emotional condition deteriorate.

***Delicia Walker and Plaintiff D.W.***

43.     Delicia Walker is a resident of St. Louis County and is suing as D.W.'s next friend pursuant to Fed. R. Civ. P. 17(c).

8

44.     D.W. is 30 years old and is currently detained at the St. Louis County Justice Center where he has been held since May 22, 2025, on cause no. 25SL-CR03643, which is two misdemeanor charges. In the probable cause statement, the charges are based on allegations that D.W. was wandering naked around the St. Louis Airport terminal and assaulted a law enforcement officer by "flipping [the officer's] eyeglasses from [their] face.".

45.     On or about July 28, 2025, D.W.'s public defender filed a motion requesting a mental examination. The judge ordered that examination on November 3, 2025. On November 21, 2025, DMH wrote a letter stating they would not schedule the examination until they were provided with copies of the police report.

46.     Defendants have failed to timely provide the evaluation services to D.W. required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, D.W. has been waiting **21 days** for a mental health evaluation.

*Defendants*

47.     Defendant Department of Mental Health is the State of Missouri's state-wide agency charged with providing competency evaluation and competency restoration services to individuals facing criminal charges. DMH is specifically charged with operating, funding and licensing modern treatment and habilitation programs provided in the least restrictive environment possible, and improving public understanding of and attitudes toward mental illness. Mo. Rev. Stat. § 630.020.

48.     Defendant Valerie Huhn is sued in her official capacity as Director and chief executive officer of the Missouri Department of Mental Health. In her capacity as Director of DMH, Defendant Huhn, with the advice of the Mental Health Commission, is responsible for the overall operations of DMH and its three divisions: Behavioral Health, Developmental Disabilities, and Administrative Services. Her duties include planning, supervising, and evaluating the

9

provision of services for Missourians with mental disorders, developmental disabilities, and substance use disorders.

49.    Defendant Dr. Mina Charepoo is a member of the Mental Health Commission. In that capacity, Dr. Charepoo is responsible for advising Director Huhn "as to all phases of department practices in order to make them compatible with professional standards," including care facilities and programs, recruitment and training, and accessibility of services. *See* Mo. Rev. Stat. § 630.015. Dr. Charepoo is sued in their official capacity.

50.    Defendant Dr. Kishore Khot is a member of the Mental Health Commission. In that capacity, Dr. Khot is responsible for advising Director Huhn "as to all phases of department practices in order to make them compatible with professional standards," including care facilities and programs, recruitment and training, and accessibility of services. *See* Mo. Rev. Stat. § 630.015. Defendant Khot is sued in their official capacity.

51.    Defendant Brian Neuner is a member of the Mental Health Commission. In that capacity, Neuner is responsible for advising Director Huhn "as to all phases of department practices in order to make them compatible with professional standards," including care facilities and programs, recruitment and training, and accessibility of services. *See* Mo. Rev. Stat. § 630.015. Defendant Neuner is sued in their official capacity.

52.    Defendant Lynne Unnerstall is a member of the Mental Health Commission. In that capacity, Unnerstall is responsible for advising Director Huhn "as to all phases of department practices in order to make them compatible with professional standards," including care facilities and programs, recruitment and training, and accessibility of services. *See* Mo. Rev. Stat. § 630.015. Defendant Unnerstall is sued in their official capacity.

53.     Defendant Jhan Hurn is a member of the Mental Health Commission. In that capacity, Hurn is responsible for advising Director Huhn "as to all phases of department practices in order to make them compatible with professional standards," including care facilities and programs, recruitment and training, and accessibility of services. *See* Mo. Rev. Stat. § 630.015. Defendant Hurn is sued in their official capacity.

54.     Defendant Dennis Tesreau is a member of the Mental Health Commission. In that capacity, Tesreau is responsible for advising Director Huhn "as to all phases of department practices in order to make them compatible with professional standards," including care facilities and programs, recruitment and training, and accessibility of services. *See* Mo. Rev. Stat. § 630.015. Defendant Tesreau is sued in their official capacity.

55.     Defendant Teresa Coyan is a member of the Mental Health Commission. In that capacity, Coyan is responsible for advising Director Huhn "as to all phases of department practices in order to make them compatible with professional standards," including care facilities and programs, recruitment and training, and accessibility of services. *See* Mo. Rev. Stat. § 630.015. Defendant Coyan is sued in their official capacity.

## FACTS

56.     Prosecuting an individual who does not have the capacity to stand trial violates the Due Process Clause of the Fourteenth Amendment. *Pate v. Robinson*, 383 U.S. 375, 377–78 (1966).

57.     To have capacity, a criminal defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." *Dusky v. U.S.*, 362 U.S. 402, 402 (1960).

58.     A defendant is presumed to have mental fitness to proceed, and the burden of proof to destroy that presumption is by a preponderance of the evidence. Mo. Rev. Stat. § 552.020.9.

## I. **Under Missouri law, DMH is charged with providing competency evaluation and restoration services to individuals charged with a crime.**

59.     Chapter 552 of the Missouri code addresses the rights and protections afforded to a person charged with a crime who lacks capacity to understand proceedings against them. DMH is required to provide competency evaluations and restoration treatment for these individuals in custody. But this system is broken.

60.     To comply with due process, Missouri law provides that, "[n]o person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or her or to assist in his or her own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." Mo. Rev. Stat. § 552.020.

61.     The terms "mental disease or defect" include congenital and traumatic mental conditions, as well as disease. Mo. Rev. Stat. § 552.010.

62.     Missouri excludes from the definition of mental disease and defect "abnormality manifested only by repeated criminal or otherwise antisocial conduct . . . alcoholism without psychosis or drug abuse without psychosis or an abnormality manifested only by criminal sexual psychopathy." Mo. Rev. Stat. § 552.010.

### A. *Missouri's statutory process when a defendant is incompetent to stand trial.*

63.     Mo. Rev. Stat. § 552.020 describes the process that courts must follow to determine whether a criminal defendant (the "defendant") lacks mental capacity to stand trial.

64.     This process mirrors the federal statutory scheme for defendants who may lack capacity to stand trial. *State v. Tilden*, 988 S.W.2d 568, 573 (Mo. Ct. App. 1999) ("Only a slight difference exists between our statute and the federal law. Federal law demands an exam if there is reasonable cause for the court to believe the defendant 'may presently be suffering,' as compared

to Missouri's language of, 'whenever any judge has reasonable cause to believe the accused lacks mental fitness to proceed.'"); *see generally*, 18 U.S.C. § 4241.

65. This process in Missouri starts with a competency evaluation, which can be ordered by the court on its own motion, or upon a motion filed by the state, or on behalf of the defendant. If the court has "reasonable cause to believe" the defendant "lacks mental fitness to proceed," it can order the defendant be examined by a psychiatrist or psychologist. Mo. Rev. Stat. § 552.020.1.

66. Currently, all individuals conducting competency evaluations in Missouri are DMH employees.

67. Due process requires DMH to complete an assessment of a defendant's mental state within a reasonable amount of time. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

68. Missouri law is more explicit: Once the defendant is examined, a report of the examination must be filed with the Court within sixty days of the initial order for an examination. Mo. Rev. Stat. § 552.020.3.

69. The examination report must include the following:

a. An opinion as to whether the defendant has a "mental disease or defect;" whether the defendant lacks capacity to understand the proceedings against them or assist in their own defense based upon a reasonable degree of medical or psychological certainty; and whether the defendant will be mentally fit to proceed in the "reasonably foreseeable future." Mo. Rev. Stat. § 552.020.3.

b. A recommendation as to whether the defendant should be held in custody in a suitable hospital facility for treatment pending determination, by the court, of mental fitness to proceed. Mo. Rev. Stat. § 552.020.3(5).

13

c.  A recommendation as to whether the defendant, if found by the court to lack the mental fitness to proceed, "should be committed to a suitable hospital facility for treatment to restore the mental fitness to proceed or if such treatment to restore the mental fitness to proceed can be provided in a county jail or other detention facility approved by the director or designee." Mo. Rev. Stat. § 552.020.3(5).

70.  If the defendant is not charged with a dangerous felony as defined in § 556.061, murder in the first degree under § 565.020, or rape in the second degree under § 566.031, or the attempts thereof, the statute also requests a recommendation as to whether the defendant, if found to lack the mental fitness to proceed, maybe appropriately treated in the community or is able to comply with bond conditions as set forth by the court and is able to comply with treatment conditions and requirements as set forth by the director of the department or his or her designee. Mo. Rev. Stat. § 552.020.3(8).

71.  If the report contains the recommendation that the accused should be committed, the Court may order that the defendant be "committed to or held in a suitable hospital facility" pending its determination of the defendant's mental fitness to proceed. Mo. Rev. Stat. § 552.020.6.

72.  When the court determines that the accused can comply with bond and treatment conditions, the court shall order that the accused remain on bond while receiving treatment. Mo. Rev. Stat. § 552.020.4.

73.  If there is no request for a second examination and the findings of the initial examination report are uncontested, the court must determine the issue of the defendant's mental fitness to proceed—either based on the report or following a hearing. Mo. Rev. Stat. § 552.020.8.

74.  If the Court determines that the defendant "lacks mental fitness to proceed," criminal proceedings are suspended and the person deemed incompetent to stand trial ("IST") is

14

committed "to the director of the department of mental health." Mo. Rev. Stat. § 552.020.10. Section 552.020.10 requires the DMH Director, or their designee, "notify the court and the parties of the location and conditions for treatment." *Id*.

75.     Another examination is required six months after commitment to ascertain whether the defendant's mental fitness has improved, and the case may proceed; and, if not, whether there is a substantial probability that the accused will attain the mental fitness to proceed to trial in the foreseeable future. Mo. Rev. Stat. § 552.020.12(1). A written report of this examination must be filed with the court within 30 days. Mo. Rev. Stat. § 552.020.12(1).

76.     Based on this subsequent report, or after holding a hearing, the court must reach one of three conclusions regarding the defendant's competency and criminal proceedings: (1) that the defendant has regained mental fitness and the criminal proceedings resume, Mo. Rev. Stat. § 552.020.12(4); (2) that the defendant still lacks capacity (*i.e.*, is still IST) but there is a substantial probability they will be mentally fit in the foreseeable future (at which point commitment continues, and the defendant will be re-evaluated within the next 6 months), Mo. Rev. Stat. § 552.020.12(5); or (3) the defendant lacks fitness to proceed and will not regain fitness in the foreseeable future, Mo. Rev. Stat. § 552.020.12(6) (also referred to as permanently incompetent to stand trial, or "PIST").

77.     When a criminal defendant is determined to be PIST, there will be concurrent proceedings to determine if the accused should be involuntarily detained (*i.e.*, civilly committed) or have a guardian appointed. Mo. Rev. Stat. § 552.020.12(6). Once there has been a civil commitment or guardian appointed, the criminal charges must be dismissed without prejudice. *Id*.

**B.  DMH has fewer beds than it did decades ago and struggles to retain staff.**

78.     Over the last 30 years, DMH has reduced the number of inpatient psychiatric beds it operates.

15

79. For example, from 1990 to 2008, DMH reduced the number of inpatient psychiatric beds it operated from 1,662 to 1,226.[5]

80. More recently, however, the number of competency evaluations requested pre-trial has increased from 618 in fiscal year 2018 to 967 in fiscal year 2023.[6]

81. In 2012, the Missouri Legislature and Governor pushed through major budget cuts to DMH.

82. These budget cuts impacted the number of available evaluators, DMH staff, and further limited the available number of DMH forensic beds.

83. Director Huhn has recently acknowledged that 10 years ago, DMH had more forensic beds available than what it has today—10 years ago, there would have been over 200 additional beds to what exists today to ensure timely restoration treatment.

84. DMH also continued to reduce the number of available beds even as the waitlist approached crisis levels: in 2021, as DMH's waitlist was growing, DMH tore down a hospital with available beds and did not promptly replace them elsewhere.

85. DMH currently provides competency restoration services at three psychiatric hospitals located throughout the State: Center for Behavioral Medicine (in Clay County); Nixon Forensic Center at Fulton State Hospital (in Callaway County); and the St. Louis Forensic Treatment Center-North (formerly Metropolitan Psychiatric Center).

86. Individuals charged with certain dangerous crimes are sent to Fulton State Hospital.

---

[5] *Elimination of State-Operated Acute Psychiatric Inpatient and Emergency Services in Missouri*, MISSOURI HOSPITAL ASSOCIATION, April 2012, https://hcfdecadeofdifference.org/sites/default/files/event/attachments/do18889556.pdf
[6] DMH Presentation to MSPD by Timothy Wilson and Jeannette Simmons, attached hereto as **Exhibit 1**.

16

87.     All other individuals are admitted to the Center for Behavioral Medicine (if they are on the west side of the state) or the Forensic Treatment Center-North (if they are on the east side of the state).

88.     According to public testimony from Director Huhn in May 2025 testimony, capacity at the Center for Behavioral Medicine is set to increase from 65 to 115. However, this is not expected to occur until 2028 at the earliest, upon completion of construction of a new facility—a project which has not yet begun. As of May 2025, the Center for Behavioral Medicine had only 57 open beds; 8 were "offline" due to construction.

89.     Fulton State Hospital has 454 inpatient beds focused, at least in part, on individuals in need of a higher-security setting and deemed IST, PIST, or Not Guilty by Reason of Insanity.

90.     Forensic Treatment Center-North has 75 beds. In fiscal year 2023, DMH received an additional $3.2 million to add 25 beds and staffing at the facility.

91.     A new DMH facility is to be constructed in the Kansas City area. DMH believes this will add 150 beds to the State's competency system. However, construction is not planned to be completed until 2029 at the earliest.[7]

92.     DMH believes it is continually at absolute bed capacity for competency restoration.

93.     DMH also experiences staffing challenges which contribute to wait times. According to Director Huhn, about 60% of direct-care staff quit the agency each year.

---

[7] DMH Presentation to House Health and Mental Health Committee dated May 5, 2025, attached hereto as **Exhibit 2** ("May 2025 Presentation").

## II. **In practice, Plaintiffs and hundreds of class members are jailed for unreasonable amounts of time awaiting court-ordered capacity assessments and restoration services that Defendants are required to provide.**

94.     The current reality in Missouri is that people deemed incompetent to stand trial will wait in jail an average of 14 months before being transferred to one of the three facilities mentioned above, even after having waited several months for an evaluation in the first instance.

95.     These wait times have worsened over the last decade as DMH has kicked the can on producing any real solution to this dire problem and otherwise failed its statutory and constitutional obligations to provide timely competency evaluations and restoration treatment.

### A. *The number of people on the waitlist has grown.*

96.     The number of people in Missouri jails waiting for DMH treatment has grown over the past decade.

97.     The waitlist has grown by 33% since September 2024 and almost 88% since September 2023.

98.     As of September 2021, the number of people in Missouri jails waiting for DMH treatment was 106. By June 2023, it was 243. That number has more than doubled since.

99.     In August 2025, the number of people waiting in jail for court-ordered restoration treatment reached 492, a new all-time high.

100.     In September 2025, an average of 487 Missourians were waiting for a bed in a psychiatric hospital run by DMH. Hundreds more are in jail waiting for a competency evaluation.

101.     These individuals are detained around the state, in rural and urban areas alike. According to a survey conducted by Missouri Appleseed, 92.5% of jail facilities (representing 54 unique Missouri counties) indicated they held individuals awaiting assessments by DMH. While

18

these individuals are detained throughout the state, the jails with the highest number of such individuals are St. Louis County, the City of St. Louis, Greene County, and Boone County.[8]

**B.** *As the number of people on the waitlist has grown, wait times have lengthened.*

102.    In 2023, wait times for DMH services were approximately 8 months.[9]

103.    By 2025, those wait times have grown to between 1.5 and 2.8 years for an incarcerated person to be transferred to an appropriate mental health facility, and 6 to 11 months for initial assessments.[10]

104.    In one instance, a county reported having someone in jail for more than 3 years awaiting treatment by DMH.[11]

105.    In some cases, people are jailed longer than the maximum sentence they could receive if convicted.[12]

106.    At one point in 2025, up to twelve people were incarcerated beyond the maximum possible jail sentence available for their charges while awaiting competency restoration.[13]

107.    Prosecuting attorneys and judges contribute to the DMH waitlist by failing to dismiss charges after class members have served more than the maximum sentence they could receive if convicted of the still-pending charges.

---

[8] *See* Missouri Appleseed Report, **Exhibit 3** ("Appleseed Report"), 14, Figure 3.

[9] Clara Bates, *Missourians wait an average of 8 months in jail for court-ordered mental health services*, MISSOURI INDEPENDENT, Sept. 20, 2023, https://www.stlpr.org/government-politics-issues/2023-09-20/missourians-wait-an-average-of-8-months-in-jail-for-court-ordered-mental-health-services

[10] Appleseed Report, Ex. 3, at 14, 22.

[11] Appleseed Report, Ex. 3, at 15, 22.

[12] *Wait for Competency Restoration Averages 14 Months in Missouri Jails*, PRISON LEGAL NEWS, May 1, 2025, https://www.prisonlegalnews.org/news/2025/may/1/wait-competency-restoration-averages-14-months-missouri-jails/

[13] Appleseed Report, Ex. 3, at 8.

19

108.     Judges further contribute to the DMH waitlist by granting multiple extensions of time for DMH to conduct evaluations and provide restoration treatment, and failing to make timely competency findings.

### C.  Defendants have long been aware of this system-wide issue.

109.     Director Huhn has testified before the Missouri general assembly about the issues of DMH wait times on several occasions and has been well aware of the growing waitlist problem for the past several years.

110.     For example, the legislature asked Director Huhn questions about the steadily increasing numbers of people on the waitlist in December 2023. At that time, she acknowledged the problem and said that despite DMH working to mitigate the situation, the number of people waiting in jail for services "does keep going up."[14]

111.     At the Missouri Summit on Competence to Stand Trial held in April 2024, Deputy Director Dr. Jeanette Simmons presented on the issue of DMH's waitlist and attempts to eliminate or reduce it.

112.     On May 5, 2025, Director Huhn testified before the House Health and Mental Health Committee.[15]

113.     In her testimony, Director Huhn identified waitlists for evaluation or treatment by DMH as a "critical issue." At that time, she noted hundreds of people waiting for DMH services at various points in the process.

---

[14] Clara Bates, *Even more Missourians are stuck waiting in jails for court-ordered mental health treatment*, MISSOURI INDEPENDENT, Dec. 13, 2023, https://www.kcur.org/news/2023-12-13/even-more-missourians-are-stuck-waiting-in-jails-for-court-ordered-mental-health-treatment ("*Even more Missourians are stuck waiting in jails for court-ordered mental health treatment*").

[15] *See* May 2025 Presentation, Ex. 2.

114.    For example, Director Huhn testified that 430 individuals were held in county jails waiting for admission to DMH following a court order for competency restoration and that the wait for these individuals is about 14 months.

115.    Another 230 individuals were held in jails pending a pre-trial evaluation, and Director Huhn anticipated approximately half of those individuals would receive court orders for restoration treatment by DMH.

116.    Both Director Huhn and Dr. Simmons testified before the House Corrections and Public Institutions Committee on September 8, 2025.[16] As of that date, 487 individuals were waiting for a bed in a DMH-run hospital, 58 were awaiting a commitment order from the court, and 187 were awaiting their competency evaluation.

117.    Last year, Chief Justice Mary Russell called on leaders to address this very issue in her February 7, 2024 state of the judiciary address, stating:

> Our jails have become the largest mental health facilities in our counties. But that is not how jails are designed, nor how their staff are trained. Jails should be used in the short term to detain people accused of crimes or found guilty of minor crimes. Concrete cell blocks are not conducive for treating mental health or addiction issues.[17]

118.    The unconstitutional, severe backlog for competency assessment and transfer leads to worsening mental health for class members.

---

[16] Hearing Before the Comm. on Corr. and Public Institutions, 2025 Leg. 103 (Statements of Huhn and Simmons on behalf of DMH), https://sg001-harmony.sliq.net/00325/Harmony/en/PowerBrowser/PowerBrowserV2/20200831/-1/13438?mediaStartTime=20250908101656&mediaEndTime=20250908103324&viewMode=3&globalStreamId=4

[17] C.J. Mary Russell, State of the Judiciary Address, Feb. 7, 2024, https://www.courts.mo.gov/page.jsp?id=205313

### III. Evaluation and Restoration Class members are harmed by prolonged detentions in county jails that are not equipped to provide mental health treatment.

119.    Without access to a DMH placement, class members remain confined in jail, a carceral environmental ill-equipped to manage, let alone treat, serious mental illness.

120.    On average, members of the Evaluation Class serve between 6 and 11 months in jail before even receiving their court-ordered assessment.

121.    Members of the Restoration Class serve another 1.5 to 2.8 years in jail—or more— before being transferred to a DMH facility pursuant to court order.

122.    The extended incarceration in jails while awaiting placement in DMH for competency restoration services places the burden on county jail administrators and personnel to meet the mental health needs of these individuals and keep them safe.

123.    Most of the people on DMH's waitlist have been diagnosed with schizophrenia or mood disorders, such as bipolar disorder.

124.    County jails in Missouri lack the resources, staff, and training necessary to provide services for individuals with serious mental health disabilities.

125.    This is particularly true given how many individuals most Missouri jails are forced to house for DMH while they remain on the waitlist: one sheriff, testifying before the Missouri Legislature, stated that his jail regularly has almost 10% of its detained individuals on a DMH waitlist.

126.    DMH has acknowledged in its own records that class members' mental health, "will continue to deteriorate… in many cases individuals never fully recover from the extended period of decompensation."[18]

---

[18] *Even more Missourians are stuck waiting in jails for court-ordered mental health treatment.*

127.     Jails are not therapeutic environments. They are noisy, crowded, rigid, and isolating environments that pose serious risks of harm to individuals with mental health disorders and work against competency restoration.[19]

128.     For example, detainees must interact with correctional officers on a daily basis. But correctional officers lack the specialized training required to interact appropriately with class members with serious mental illnesses and respond to symptoms of mental illness with punishment rather than with treatment.

129.     Jail staff recognize the limitations of the jail environment for dealing with mental health disorders. As the Mexico County Sheriff told State Rep. Kent Haden: "I am not prepared to handle mental health issues in my jail."[20]

130.     In a recent survey of Missouri County jail facilities, County Sheriffs acknowledge that their jails face significant barriers in caring for those awaiting beds in DMH: 48.5% of respondents to the survey stated that a lack of space or beds in their jail due to mental health holds was a "difficult" or "very difficult" challenge.[21]

131.     When housed among other jail detainees, persons with mental health disabilities and other cognitive disabilities are especially vulnerable to manipulation, threats, and aggression by others—including both staff and other people detained at the jail.

132.     These conditions of confinement do not further the goal of competency restoration. To the contrary, they exacerbate mental illness.

---

[19] Douglas, Alexandra, *Caging the Incompetent: Why Jail-Based Competency Restoration Programs Violate the Americans with Disabilities Act under Olmstead v. L.C.*, 32 Geo. J. Legal Ethics 525 (2019).

[20] Clara Bates, *Hundreds of Missourians continue to languish in jail waiting for mental health services*, MISSOURI INDEPENDENT, May 7, 2025, https://missouriindependent.com/2025/05/07/hundreds-of-missourians-continue-to-languish-in-jail-waiting-for-mental-health-services/ ("*Hundreds of Missourians continue to languish in jail waiting for mental health services*")

[21] Appleseed Report, Ex. 3, at 18, Figure 9.

23

133. As Commander of Jail Operations for Cape Girardeau County Jail put it: Jail is the worst place you can put people with mental health issues.

134. This is especially true because many, if not most, county jails do not offer therapeutic care and do not provide medication appropriate for the degree of mental health symptoms being experienced by Evaluation or Restoration Class members.

135. Many jails will not even provide medication that individuals were prescribed or taking prior to their incarceration.

136. Further, jails are not permitted to involuntarily medicate individuals, which is an available treatment resource when Restoration Class members are in a DMH facility. This is especially important for individuals suffering from schizophrenia or schizoaffective disorders, where there is little to no possibility of regaining competency without medication, and the nature of the disorder's symptoms (such as delusions) make it unlikely that Restoration Class members will choose to seek out that medication.

137. An anecdote from an anonymous Missouri County Sheriff illustrates this predicament:

> I have a big guy, about 6'4" and 300 pounds, who hears voices. When he's in gen[eral] pop[ulation], he starts fights when he thinks others are talking about him. Everyone else gangs up on him and ends up injured. **I have to put him in solitary to keep him from hurting others or getting beat up, but when he's in solitary he cries from loneliness. It's heartbreaking. I don't know what to do. He's been assessed incompetent by DMH but has been waiting for a bed for over a year.** I've called anyone I can think of to try and get him out of here, with no luck.[22]

138. Because persons who have severe mental health disabilities or other cognitive disabilities often have problems following jail rules and regulating their conduct, and for the safety

---

[22] Appleseed Report, Ex. 3, at 2 (emphasis added).

and security of individuals at the jail, jail staff often resort to solitary confinement, restraints, or other extreme confinement and isolation measures to manage physical aggression, outbursts, or other problematic behaviors. Even without outbursts, class members are typically housed alone in a cell, resulting in further isolation.

139. The severe physical and psychological harms associated with solitary confinement are well researched and documented. Solitary confinement exacerbates preexisting mental health issues. The practice greatly increases the risk of self-harm, and prolonged solitary confinement is associated with anxiety, panic paranoia, hallucinations, and suicidal ideation, in addition to physical harms including headaches, heart palpitations, digestive problems, cognitive dysfunction, injuries to oneself, and death by suicide.

140. Studies have shown that solitary confinement can rapidly change the brain of an isolated incarcerated person, causing devastating, permanent and traumatic damage. Exposure to solitary confinement can cause a portion of the human brain to physically shrink in size.

141. The United Nations Special Rapporteur on Torture, an independent expert mandated by the United Nations Commission on Human Rights to monitor torture, has determined that any solitary confinement lasting beyond 15 days constitutes torture or cruel, inhumane, and/or degrading treatment in violation of international human rights law.

142. And there is widespread national and international consensus among physicians, mental health researchers, and human rights authorities that extreme isolation should be abolished because of its devastating impact on those forced to endure it.

143. Persons with serious mental health disabilities will often decompensate when detained for long periods of time without appropriate mental health care or restoration services. In

other words, there is an acute and significant deterioration in a person's mental health who is *already* suffering so much that they are incompetent to stand trial.

144. This decompensation increases the risk of immediate harm to the individual, and the likelihood of harm to correctional staff or other detainees.

145. But crucially, this decompensation can have lasting effects, making capacity restoration more difficult or even impossible.

146. There is a large amount of clinical research showing that, when an individual is experiencing an acute psychotic episode, a manic state or a depressive or suicidal crisis, the longer that individual is left untreated or inadequately treated, the worse the prognosis.

147. Director Huhn acknowledged in public testimony that decompensation of individuals on the waitlist was resulting in permanent loss of competency—that some individuals who could have been restored to competency have deteriorated to the extent that they are civilly committed, essentially confined to a state psychiatric hospital indefinitely.

148. Director Huhn acknowledged in public testimony that DMH was risking harm to Evaluation and Restoration Class members by making people wait for court-ordered evaluations and treatment: "I just wanted to make everybody aware of some of the risks that we know we're taking on because we can't get these individuals from jail into our state operated hospitals. Obviously, their illness is worse, and as their treatment is delayed, that makes it harder for us to turn them around."[23]

149. Some individuals are so sick they are incapable of caring for themselves in the most basic ways and must be hospitalized to ensure they do not die in jail custody awaiting DMH treatment.

_____

[23] *Hundreds of Missourians continue to languish in jail waiting for mental health services.*

150.     Some class members refuse to come out of their cell for any reason, resulting in the use of force to conduct cell extractions of mentally ill class members.

151.     Some die in jail custody awaiting DMH services.

152.     Others suffer greatly and decompensate.

153.     For example, while detained at the St. Louis County jail, where he has been waiting over one year for treatment, one Restoration Class Member has started vocalizing active delusions and grandiose and conspiratorial thoughts. He is no longer able to recognize the sound of his own voice and has an uncontrollable physical tic that was not present before his detention. In addition, his weight and hygiene are unstable, and he periodically refuses to take his medication.

154.     Another person who was previously in the Restoration Class before his recent transfer was detained in Taney County Jail for over a year and a half. During this time, his mental health worsened. He was unable to practice personal hygiene, and his symptoms of schizophrenia worsened in jail. His family was rarely able to see him in Taney County because he was generally kept in administrative segregation. He reported feeling extreme loneliness, isolation and worsening symptoms, especially because of the lack of consistent sleep in a loud and noisy jail environment. When this individual was finally taken to DMH, he did not know why he was in jail, when he would leave, or basic facts about his life.

155.     M.T. has been detained in St. Louis County Jail for over a year while waiting for DMH treatment. During that time, he has lost a significant amount of weight and several teeth.

156.     Criminal defense attorneys regularly observe clients who are on the DMH waitlist decompensating while waiting in jail custody without treatment. For example, they report seeing clients become nonverbal, catatonic, regularly eating their feces, peeling and picking their skin off,

27

and peeling their fingernails and toenails. They also observe clients' suicidality and delusions worsen.

### IV. Defendants have failed to take reasonable steps to remedy these unconstitutional wait times for critical mental health services.

157.    The waitlist and wait times are growing despite meager action by DMH, and they will continue to do so absent court intervention.

158.    On February 5, 2024, Director Huhn testified before the Missouri House Committee on Health, Mental Health, and Social Services. The primary purpose of this testimony was to lay out the fiscal appropriations and expenditures of DMH.

159.    Director Huhn stated that, as of the hearing, the waitlist for competency evaluation and restoration consisted of 297 individuals, but that the number would grow.

160.    Director Huhn asked for no additional fiscal appropriations.

161.    DMH supported certain legislative changes implemented in Senate Bill 106 (2023) with the goal of addressing wait times for evaluations and treatment. Three of these changes included: (a) adding the ability to find PIST in the first evaluation; (b) creating an option for community-based restoration; and (c) requiring evaluators to opine on the appropriateness of jail-based restoration. *See* Mo. Rev. Stat. § 552.020.

162.    These changes are insufficient to address the full extent of the crisis, particularly given DMH's poor implementation.

163.    The waitlist continues to grow, reaching nearly 500 individuals awaiting treatment by August 2025.[24]

---

[24] Steph Quinn, *Nearly 500 Missourians awaiting court-ordered mental health services, an all-time high*, MISSOURI INDEPENDENT, Oct. 27, 2025, https://missouriindependent.com/2025/10/27/nearly-500-missourians-awaiting-court-ordered-mental-health-services-an-all-time-high/.

28

### A. *Permanently Incompetent to Stand Trial (PIST) finding provides an early "out."*

164.    SB 106 added language requiring an evaluator to assess, at the initial evaluation, "whether there is a substantial probability that the accused will be mentally fit to proceed in the reasonably foreseeable future." Mo. Rev. Stat. § 552.020.3(4). In effect, this permits evaluators to assess someone as permanently IST at the first evaluation.

165.    The new language regarding PIST is meant to create capacity by removing from the treatment waitlist people with an injury or condition that renders their competency non-restorable. An example of this is an individual with dementia or a severe developmental disability.

### B. *Community-based restoration is an option in letter, but not in practice.*

166.    As revised by SB 106, Missouri law permits someone charged with a crime and found IST to receive competency restoration treatment in the community (for example, at an outpatient facility or in their family home). The law requires that DMH's initial evaluation report include an opinion regarding whether the defendant "may be appropriately treated in the community." Mo. Rev. Stat. § 552.020.3(8)(b).

167.    In practice, community-based placement for restoration treatment is grossly underutilized.

168.    Missouri has twelve Certified Community Behavioral Health Organizations that provide community-based restoration.

169.    According to testimony from Dr. Simmons in January 2025, only two people had been ordered into community-based restoration.

### C. *Jail-based restoration is a non-solution.*

170.    SB 106 also imposed a requirement that evaluators assess whether the individual may receive restoration treatment "in a county jail or other detention facility." Mo. Rev. Stat.

§ 552.020.3(7). This is sometimes referred to as "jail-based restoration," and has been implemented to varying degrees at four jails in the State of Missouri.

171.    Jail-based competency restoration is sometimes proffered as a remedy to this constitutional crisis. But this solution is woefully inadequate for the reasons set forth below—many of which are the same as the reasons why lass members are at heightened risk of harm in a jail setting, period.

172.    Jail environments are not conducive to mental health treatment.

173.    Mental healthcare providers are often hindered in the provision of care by jail rules and regulations, even if those rules are harmful to the mental health of the patient.

174.    Jails are "interpersonally fragmented, physically divided, and procedurally overcontrolled." This structure inhibits meaningful contact between treatment providers and inmates, compromising clinicians' ability to assess and respond to their patients' complex mental health needs." Douglas, Alexandra, *Caging the Incompetent*, 32 Geo. J. Legal Ethics 525 (2019).

175.    Additionally, "treatment providers may feel pressured to engage in custodial activities that undermine an IST patient's mental health, like testifying in a disciplinary hearing that results in their patient's placement in solitary confinement." *Id.*

176.    In addition, jails are chronically under-resourced and understaffed. This lack of funding would inevitably affect the implementation of any jail-based treatment.

177.    For example, Perry County Sheriff Jason Klaus, when interviewed by the Missouri Independent, said there is no room in his budget to hire a medical team to provide care to detained individuals, including those who are in the Evaluation or Restoration Class. Jail-based restoration has been implemented poorly and incompletely in Missouri.

178.    Currently, only four jail facilities in Missouri have even attempted to implement jail-based restoration programs.

179.    In St. Louis County's jail-based restoration program, Restoration Class members are kept in solitary conditions and receive no mental health treatment except medication.

180.    When Restoration Class members held in a jail-based restoration program can meet with a mental healthcare provider, they are simply coached on how to pass the competency exam. That is to say, the provider runs through the competency exam with the class members in the hope they will memorize the "correct" answers—no real effort is made to treat the underlying condition causing the incompetency.

### D. DMH's mobile teams do not provide constitutionally adequate competency restoration treatment.

181.    DMH has two mobile teams who allegedly provide treatment and support for class members in jails: one team supports the east side of the state; the other supports the west side.

182.    Each team consists of an advanced practice nurse or nurse practitioner, a "diversion specialist" or social worker, and a community support nurse.

183.    These mobile team services are focused almost exclusively on providing medication consultation and prescribing medication.

184.    The mobile teams do not provide constitutionally adequate restoration treatment.

185.    At least one jail operator described DMH's forensic mobile team as "a joke."

186.    Despite all these efforts, the DMH waitlist has continued to grow.

### V. Experiences of Named Plaintiffs

### A. K.M.

187.    K.M. is a 64-year-old Black man who is currently detained at the Buchanan County Jail, where he has been held since June 7, 2024.

31

188.    Upon information and belief, K.M. has a physical disability resulting from an accident but has had no previous mental health diagnoses.

189.    At the time of his arrest, K.M. was living on his own and supporting himself financially.

190.    K.M. was arrested on or about June 7, 2024, and has been in custody since on cause no. 24BU-CR01033.

191.    On November 26, 2024, the Circuit Court entered an order for mental examination in K.M.'s criminal case.

192.    On January 24, 2025, the Circuit Court entered an order finding K.M. IST, suspending proceedings, and remanding K.M. "to the Sheriff of Buchanan County to be immediately delivered to the care and custody of the Department of Mental Health or at such other facility as requested by the Director of the Department of Mental Health."

193.    Defendants have failed to take custody of K.M. and timely provide the restoration services required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, K.M. has been waiting **304 days** for restoration treatment.

194.    While K.M. languishes in jail on DMH's waitlist, his mental and emotional condition deteriorate.

195.    K.M. is represented by his brother, Eric Massey, as next friend.

196.    Eric Massey is K.M.'s older brother. Mr. Massey and K.M. grew up together in St. Joseph, Missouri, where K.M. was living at the time of his arrest.

197.    K.M. is close to his family, which includes five other siblings (one other brother and four sisters).

198.     Before K.M. was incarcerated, his brother spoke with and saw him regularly, often multiple times a week.

199.     K.M.'s brother was able to speak with him when he was first incarcerated, but it has been many months since the jail has allowed K.M. to have any contact with his family.

200.     K.M.'s brother believes that his incarceration and isolation from family while his criminal case is being held in abeyance and not progressing is negatively affecting his mental health.

**B.  M.R.**

201.     M.R. is a 31-year-old Black man and is currently detained at the Jackson County detention center and on a waitlist for DMH services.

202.     M.R. has a history of mental health concerns, including schizophrenia, depression, and other diagnoses. He has experienced psychosis since late adolescence. He has been psychiatrically hospitalized on several occasions.

203.     M.R. was previously evaluated for IST by DMH in separate criminal cases and spent time in the Center for Behavioral Medicine and Northwest Missouri Psychiatric Rehabilitation Center.

204.     M.R. was arrested on April 11, 2024, in cause no. 2416-CR01701. At the time of his arrest, M.R. was unhoused.

205.     On May 2, 2024, the Circuit Court ordered a mental examination to determine whether M.R. was competent to stand trial. The docket entry for this order indicates "Rapid Response ordered."

206.     DMH filed its evaluation report in M.R.'s case on August 21, 2024.

207.     On September 5, 2024, the Circuit Court entered an order finding M.R. incompetent to stand trial, suspending proceedings, and committing M.R. to the custody of the Director of DMH.

33

208. Defendants have failed to take custody of M.R. and timely provide the restoration services required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, M.R. has been waiting **445 days** for restoration treatment.

209. While M.R. languishes in jail on DMH's waitlist, his mental and emotional condition deteriorate.

210. M.R. is represented by his grandmother, Debra Darrington, as next friend.

211. Debra Darrington stays in regular contact with her grandson, whom she is very worried about, and makes sure that he has finances to obtain what he needs from the jail commissary. She speaks with him on the phone regularly.

212. M.R.'s grandmother is very worried that his mental health is further deteriorating while he is incarcerated and not receiving the treatment that he needs.

### C. *M.T.*

213. M.T. is a 34-year-old Black man and is currently detained at the St. Louis County Justice Center and on a waitlist for DMH services.

214. M.T. was in high school when he began displaying signs of serious mental illness. He was eventually diagnosed with both autism and schizophrenia.

215. His mother, a nurse, was able to help him get connected with a care team that included a psychiatrist and case managers.

216. For many years he had stable medication. M.T. was able to live somewhat independently, had a close relationship with his family, and even had a job.

217. There was a change in staffing on his care team, and M.T. fell out of contact with the medical providers and began missing medication.

218. M.T. began to have more active delusions and become symptomatic.

34

219. M.T.'s family, especially his mother, were desperate to find him help for his outbursts. His mother even went to the local police station with a picture of him and asked the police not to use any deadly force if they encountered him.

220. M.T. was arrested on April 26, 2024, in cause no. 24SL-CR02907-01. On March 6, 2025, the Circuit Court entered an order for mental examination.

221. On July 22, 2025, the Circuit Court entered an order finding M.T. incompetent to stand trial, suspending proceedings, and committing M.T. to the custody of the Director of DMH.

222. Defendants have failed to take custody of M.T. and timely provide the restoration services required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, M.T. has been waiting **125 days** for restoration treatment.

223. While M.T. languishes in jail on DMH's waitlist, his mental and emotional condition deteriorate.

224. According to his mother, M.T. has lost a significant amount of weight, has new dental issues, and is missing several teeth.

225. When he speaks with his family or lawyers, M.T. does not appear to understand where he is or why he is there. He has been through three different public defenders.

226. M.T. is represented by his mother, Anita Tabb, as next friend.

227. Ms. Tabb is trained as a nurse and was a nurse with the St. Louis City Public Schools for many years.

228. Ms. Tabb has observed M.T.'s mental and physical health deteriorate over his period of detention in the St. Louis County jail and finds it hard to visit him anymore because of the extent to which he has decompensated.

**D. O.J.**

229.    O.J. is a 34-year-old Black man and is currently detained at the Greene County Justice Center and on a waitlist for DMH services.

230.    O.J. was arrested on October 16, 2023, in cause no. 2331-CR03278. At a bond hearing on October 23, 2023, the Circuit Court ordered a mental examination.

231.    On or about January 3, 2024, the Circuit Court entered an order finding O.J. incompetent to stand trial, suspending proceedings, and committing O.J. to the custody of the Director of DMH.

232.    DMH filed motions for continued commitment in O.J.'s case on March 6, 2024, and October 10, 2025. Both were granted.

233.    Defendants have failed to take custody of O.J. and timely provide the restoration services required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, O.J. has been waiting **472 days** for restoration treatment.

234.    While O.J. languishes in jail on DMH's waitlist, his mental and emotional condition deteriorate.

235.    O.J. is represented by his mother, Veda Johnson, as next friend.

**E. C.T.**

236.    C.T. is a white 31-year-old man currently detained at the St. Louis City Justice Center on a waitlist for DMH services. He is represented by his mother, Carrie Miner, as next friend.

237.    C.T. was arrested on January 4, 2024, in cause no. 2422-cr00038. At his detention hearing the following day, the court ordered a competency evaluation. However, a competency report was not filed until March 5, 2025.

36

238.     On March 17, 2025, the Circuit Court entered an order finding C.T. IST, suspending proceedings, and committing C.T. to the custody of DMH. On September 2, 2025, DMH requested more time to provide treatment to C.T. due to waitlists at each of its facilities.

239.     Defendants have failed to take custody of C.T. and timely provide the restoration services required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, C.T. has been waiting **252 days** for restoration treatment.

240.     While C.T. languishes in jail on DMH's waitlist, his mental and emotional condition deteriorate. He reports having been on suicide watch more than once and generally being on lockdown in his cell 24 hours per day. He has not had a single phone call during his nearly two years of incarceration, and so has not been able to communicate with his mother, Carrie Miner, or with his grandmother. C.T. often leaves sentences unfinished and periodically has nonsensical and loud verbal outbursts. He reports being threatened by other detainees at the jail and fears for his life.

241.     C.T. is represented by his mother, Carrie Miner, as next friend.

**F.  D.W.**

242.     D.W. is a 30-year-old Black man and is currently detained at the St. Louis County Justice Center waiting for a mental health evaluation.

243.     D.W. was arrested on May 22, 2025, on 25SL-CR03643. At the time of his arrest, he was unhoused.

244.     He is being held on two misdemeanor charges. In the probable cause statement, the charges are based on allegations that D.W. was wandering naked around the St. Louis Airport terminal and assaulted a law enforcement officer by "flipping [the officer's] eyeglasses from [their] face."

245.    On or about July 28, 2025, D.W.'s public defender filed a motion requesting a mental examination.

246.    The judge ordered that examination on November 3, 2025. On November 21, 2025, DMH wrote a letter stating they would not schedule the examination until they were provided with copies of the police report.

247.    Defendants have failed to timely provide the evaluation services to D.W. required by Missouri law and the due process clause of the federal constitution. As of the filing of this complaint, D.W. has been waiting **21 days** for a mental health evaluation. The average wait for such an evaluation is approximately six months.

248.    D.W. has a history of psychiatric hospitalization.

249.    His mental health particularly began to suffer after the death of his mother when he was young.

250.    In jail, D.W. is held almost exclusively in solitary confinement.

251.    He is not aware of where he is or why he is there, and believes he is supposed to be at home.

252.    Prior to being incarcerated, D.W. had a caseworker through an Assertive Community Treatment program who assisted him in activities of daily living, secured appropriate medication, and searched for housing and other resources.

253.    Since being incarcerated, D.W.'s access to this caseworker, medication, or other parts of his treatment plan have been cut off. One of the reasons D.W.'s serious mental health conditions have worsened over the last decade is interruptions in his treatment options, which are only being exacerbated by his lengthy wait with no resources.

## VI. Class Action Allegations

254.     The named Plaintiffs bring this action on behalf of their loved ones for whom they serve as Next Friend and, pursuant to Fed. R. Civ. P. 23(b)(1) and/or (b)(2), as a class action, on behalf of two classes of persons defined as:

      a.   **The Evaluation Class:** All people who are now, or will be in the future, charged with a crime in Missouri state court and for whom a court has ordered or granted a request for a competency evaluation and who are: (a) currently detained in a county or city jail or similar facility, and (b) placed on a waitlist for competency evaluation services by DMH but who have not received evaluation services within a constitutionally-acceptable time; and

      b.   **The Restoration Class:** All people who are now, or will be in the future, charged with a crime in Missouri state court and are: (a) declared not competent to proceed to trial by the state court; (b) currently detained in a county or city jail or similar facility; (c) court-ordered to receive restoration services by DMH; and (d) awaiting, beyond a constitutionally-acceptable time, court-ordered competency restoration services to be provided by DMH or its designees (the "Restoration Class").

255.     Under Fed. R. Civ. P. 23(a), certification of a class is appropriate where: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

256.     This action is brought and may properly be maintained as a class action pursuant to 23(b)(1) and/or (b)(2), of the Federal Rules of Civil Procedure. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a).

39

## A. Typicality

257.    M.R., K.M., M.T., O.J., and C.T. are typical members of the proposed Restoration Class.

258.    D.W. is a typical member of the proposed Evaluation Class.

259.    The named Plaintiffs and class members each have a tangible and legally protectable interest at stake in this action.

260.    The claims of the named class representatives and the absent class members have a common origin and share a common basis. Their claims originate from the same illegal, unconstitutional practices of the State of Missouri. Indeed, Plaintiffs and nearly all unnamed class members were deprived of their liberty by being held.

261.    The proposed class representatives state claims for which relief can be granted that are typical of the absent class members. If brought and prosecuted individually, the claims of each class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories and seek the same relief.

262.    The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interests of absent class members to ensure that the universal claims of the class will be prosecuted with diligence and care by Plaintiffs as representatives of the class.

## B. Numerosity

263.    The members of each class are so numerous that joinder of all class members is impracticable.

264.    In September 2025, an average of 487 Missourians were waiting for a bed in a psychiatric hospital run by DMH, and hundreds more were in jail waiting for a competency evaluation.

265.    The classes also contain many future members whose names are not known, since new people are ordered to be evaluated for competency or receive restoration services each week.

266.    Nonetheless, both classes are ascertainable because the Defendants have identifying information for each class member including, but not limited to, the names of the individuals on a waitlist for evaluations, and the names of individuals on a waitlist for restoration services, in addition to various court records.

### C. Commonality

267.    The questions of law and fact common to the class include, *inter alia*:

a.  Whether Defendants' practice of failing to provide court-ordered evaluations in a timely manner violates the substantive due process rights of individuals with serious mental illness suspected to be incompetent to stand trial;

b.  Whether Defendants' practice of housing individuals who have been deemed incompetent to stand trial in county jails and putting them on a lengthy waitlist to receive restoration treatment in a timely manner violates their substantive due process rights;

c.  Whether Defendants have failed to provide competency restoration treatment to Plaintiffs and members of the Restoration Class, either at DMH or through third-party designees, within a reasonable period of time;

d.   Whether and to what extent prolonged periods of confinement in county jails or similar detention facilities while awaiting restorative services causes or exacerbates mental, emotional and physical harm to the Class members;

e.  The average period of delay caused or permitted by Defendants in the delivery of evaluation services to Evaluation Class members, and the reasons therefore;

f.   The average period of delay caused or permitted by Defendants in the delivery of restoration services to Restoration Class members, and the reasons therefore;

g.   Whether Defendants' failure to provide integrated community-based restoration treatment to Restoration Class members when a bed at a DMH facility is not available, violates Title II of the Americans with Disabilities Act; and

h.   Whether Defendants have designated third parties to provide in-jail restorative services and, if so, whether such services are being provided to the entire Class, and whether such third-party designations and services comply with Missouri law, applicable professional standards of care, and constitutional standards.

### D. Adequate Representation

268.   The named Plaintiffs, by and through their next friends, are willing and prepared to serve the court and proposed classes in a representative capacity with all obligations and duties necessary. Plaintiffs will fairly and adequately protect the interests of the class they represent and have no interests adverse to, or which directly or irrevocably conflict with the interests of either class. The self-interests of the named class representatives are coextensive with and not antagonistic to those of the absent members of both the Evaluation and Restoration Classes. The proposed representatives will undertake to protect the interests of the absent class members.

269.   The named Plaintiffs, by and through their Next Friends, have engaged the services of attorneys from MacArthur Justice Center, the American Civil Liberties Union of Missouri Foundation, ArchCity Defenders, and Husch Blackwell LLP, all firms with experience litigating complex civil rights matters in federal court, including class action lawsuits.

270.   Said counsel is experienced in complex class litigation, will adequately prosecute this action and will capably represent the named class representatives and absent class members.

42

### E. *Rule 23(b)(1)*

271.    The prosecution of separate actions by individual members of the class would create a risk of adjudication with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

272.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications among individual members of the class that would establish incompatible standards of conduct for the parties opposing the class.

### F. *Rule 23(b)(2)*

273.    The Evaluation Class and Restoration Class are cohesive, textbook examples of a Rule 23(b)(2) class: Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

274.    More specifically, DMH has failed to provide timely evaluations to each member of the Evaluation Class, and timely treatment to each member of the Restoration Class.

### G. *The named Plaintiffs are qualified individuals with a disability under the Americans with Disabilities Act.*

275.    Plaintiffs are qualified individuals with a disability as defined under 42 U.S.C. § 12131.

276.    A qualified individual with a disability is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). "'[D]isability' means, with respect

to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment" (as later described in paragraph (3)). 42 U.S.C. § 12102. Individuals do not need a formal diagnosis to meet the definition of having a "disability" or to be a "qualified individual" under the ADA.

277.    The ADA regulations mandate that a public entity administer services and programs "in the most integrated setting appropriate to the needs of the qualified individuals with disabilities." 28 CFR § 35.130(d).

278.    The ADA regulations mandate that a public entity "make reasonable modifications in policies, practices, or procedures when" they "are necessary to avoid discrimination on the basis of disability, unless the" entity can demonstrate making these "modifications would fundamentally alter the nature of the service, program, or activity." 28 CFR § 35.130(b)(7)(i).

279.    The Supreme Court of the United States addressed Title II ADA in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), where the Court considered "whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions." *Id*. The Supreme Court held a qualified yes in response to this question: "under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id*. at 587, 607.

44

280. Under *Olmstead*, the integration regulation forbids unjustified isolation of people with disabilities. *Id.* at 597; *see also* 28 CFR §35.130(d). Unnecessary isolation is a form of illegal discrimination against people with disabilities.

281. Plaintiffs are qualified individuals with a disability because they are individuals living with a mental impairment and/or serious mental illness that substantially limits one or more of their major life activities. All Plaintiffs are unable to substantially care for themselves, including maintaining proper hygiene, prosocial behavior, or otherwise manage their interactions with others. Many are non-communicative with jail staff, their attorneys, or their family. All members of the Restoration Class have been evaluated as lacking the mental capacity to stand trial.

## CLAIMS

### COUNT I
*Class-Action Claim for Prospective Relief for*
*Deprivation of Substantive Due Process Right*
**(Evaluation Class against Defendants)**

282. Plaintiffs incorporate each paragraph of this Complaint as if fully restated herein.

283. The Fourteenth Amendment of the United States Constitution prohibits states from depriving any person of life, liberty, or property without due process of law.

284. Incompetent pretrial criminal defendants have substantial and historic liberty interests in freedom from incarceration, and in receiving timely restoration treatment so that their criminal cases can proceed to trial expeditiously.

285. Due process requires that the nature and duration of pretrial confinement must bear a reasonable relation to the purpose for which an individual is confined.

286. Due process also forbids those held pretrial be subjected to impermissible punishment.

287.     Once an individual is found unable to aid and assist in their own defense, the only lawful purpose for further pretrial confinement is to ensure treatment so as to restore them to competency.

288.     Individuals found unable to aid and assist in their defense have a constitutional right to such individualized treatment as will give each of them a realistic opportunity to improve their mental condition to restore their competency.

289.     The only legitimate purpose of Plaintiffs' confinement is to determine if treatment, therapy, and other services can restore their competency so that they can stand trial.

290.     Restoration treatment cannot be provided unless and until the defendant has been evaluated.

291.     Evaluation Class members' enrollment on a waitlist, or their prolonged delay receiving an evaluation whether on a formal waitlist or otherwise, are not the result of professional judgment by Defendants or their agents. Rather, the prolonged delay in obtaining evaluation and restoration services is the result of Defendants' arbitrary, capricious and grossly negligent management, policy-setting, and resource allocation.

292.     In such circumstances, the nature and duration of their incarceration bear no reasonable relation to the restorative purpose for which the court has committed those individuals to treatment.

293.     Prolonged incarceration in county jails awaiting restorative services has caused, and will continue to cause, Plaintiffs and other Evaluation Class members to suffer aggravated mental, emotional and, in some cases, physical harm.

294.     In Missouri, criminal defendants are forced to wait in jail cells for an unreasonably long time before receiving a competency evaluation from DMH. By failing to provide evaluation

or restoration treatment in a reasonably timely manner, Defendants have violated the Fourteenth Amendment Due Process rights of Plaintiffs and the other Evaluation Class members and have failed to comply with their obligations under Missouri law.

295.    Unless enjoined by the Court, Defendants will continue to violate the constitutional rights of Plaintiffs and the other Evaluation Class members. Plaintiff D.W. and the other Evaluation Class members are therefore entitled to an order of the Court enjoining Defendants from all further violations of the Evaluation Class members' rights of due process in relation to their continued confinement while awaiting a competency evaluation by DMH.

## COUNT II
### *Class-Action Claim for Prospective Relief for Deprivation of Substantive Due Process Right*
### (Restoration Class against Defendants)

296.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated herein.

297.    The Fourteenth Amendment of the United States Constitution prohibits states from depriving any person of life, liberty, or property without due process of law.

298.    Incompetent pretrial criminal defendants have substantial and historic liberty interests in freedom from incarceration, and in receiving timely restoration treatment so that their criminal cases can proceed to trial expeditiously.

299.    Due process requires that the nature and duration of pretrial confinement must bear a reasonable relation to the purpose for which an individual is confined.

300.    Due process also forbids those held pretrial be subjected to impermissible punishment.

301.    Once an individual is found unable to aid and assist in their own defense, the only lawful purpose for further pretrial confinement is to ensure treatment so as to restore them to competency.

302.    Individuals found unable to aid and assist in their defense have a constitutional right to such individualized treatment as will give each of them a realistic opportunity to improve their mental condition to restore their competency.

303.    The only legitimate purpose of Plaintiffs' confinement is to determine if treatment, therapy, and other services can restore their competency so that they can stand trial.

304.    Restoration Class members' enrollment on a waitlist, or their prolonged delay receiving restoration services whether on a formal waitlist or otherwise, are not the result of professional judgment by Defendants or their agents. Rather, the prolonged delay in obtaining evaluation and restoration services is the result of Defendants' arbitrary, capricious and grossly negligent management, policy-setting, and resource allocation.

305.    Indeed, there are no objective criteria guiding prioritization of individuals on the waitlist, for example, based on acuity.

306.    In such circumstances, the nature and duration of their incarceration bear no reasonable relation to the restorative purpose for which the court has committed those individuals to treatment.

307.    Prolonged incarceration in county jails awaiting restorative services has caused, and will continue to cause, Plaintiffs and other Restoration Class members to suffer aggravated mental, emotional and, in some cases, physical harm.

308.    In Missouri, criminal defendants are forced to wait in jail cells for an unreasonably long time before receiving restoration services from DMH. By failing to provide evaluation or restoration treatment in a reasonably timely manner, Defendants have violated the Fourteenth Amendment Due Process rights of Plaintiffs and the other Restoration Class members and have failed to comply with their obligations under Missouri law.

309.    Unless enjoined by the Court, Defendants will continue to violate the constitutional rights of Plaintiffs and the other Restoration Class members. Plaintiffs and the other Restoration Class members are therefore entitled to an order of the Court enjoining Defendants from all further violations of the Restoration Class members' rights of due process in relation to their continued confinement while awaiting a competency evaluation by DMH.

## COUNT III
### *Discrimination in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.*
### (Restoration Class against Defendants)

310.    Plaintiffs incorporate each paragraph of this Complaint as if fully restated herein.

311.    Title II of the Americans with Disabilities Act (ADA) prohibits public entities from discriminating against persons with disabilities in their programs, services, and activities. 42 U.S.C. §§ 12131–12134.

312.    Discrimination under the ADA includes:

313.    Failing to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. 35.130(d);

314.    Employing "criteria or methods of administration...[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination" or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.," 28 C.F.R. 35.130(b)(3); and

315.    Failing to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. 35.130(b)(7).

316.    The ADA defines a "public entity" as any state or local government or "any department, agency...or other instrumentality" of a state of local government. 42 U.S.C. § 12131(1)(A), (B).

49

317. Defendants are "public entities" within the meaning of 42 U.S.C. §12131(1)(B) and 28 C.F.R. §35.104, and must comply with the ADA and its regulations, including the integration mandate and the fundamental-alteration regulation. Director Huhn is charged with oversight and operation of DMH and serves at the direction of the Mental Health Commission. Mo. Rev. Stat. § 630.015.

318. Each member of the Restoration Class is a qualified individual with a disability as defined under 42 U.S. C. §12131.

319. Defendants have failed to provide Plaintiffs with necessary mental health treatment in community-based settings nor have Defendants provided Plaintiffs with mental health services and/or treatment in the most integrated settings appropriate to the needs of all individuals in the Restoration Class.

320. Defendants' failure to provide timely competency assessments and restoration treatment for lass members, while they remain in jail, constitutes unlawful discrimination under the integration mandate of Title II of the ADA. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999) (holding that unnecessary segregation of individuals with mental health disabilities constitutes discrimination).

321. Additionally, Defendants have administered, or refused to administer, mental health services in a timely fashion, resulting in discrimination against the Restoration Class. Defendants' methods of administrating mental health services defeat, or substantially impair, benefits of the capacity assessment and restoration programs controlled by DMH.

322. Defendants have failed to make reasonable modifications in policies, practices, and procedures, which are necessary to avoid discrimination in administering mental health services to the Restoration Class.

323.     Unless enjoined from continuing current unlawful policies and practices, Defendants will continue to violate Plaintiffs' ADA rights.

**COUNT IV**
***Discrimination in Violation of the Rehabilitation Act, 29 U.S.C. § 794***
**(Restoration Class against Defendants)**

324.     Plaintiffs incorporate each paragraph of this Complaint as if fully restated herein.

325.     Section 504 of the Rehabilitation Act (the "RA") prohibits disability discrimination by entities receiving federal financial assistance. 29 U.S.C. § 794(a).

326.     Defendants are recipients of federal financial assistance as defined in 45 C.F.R. 84.3(h).

327.     Section 504 of the RA states, "No otherwise qualified individual with a disability...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. 794(a).

328.     Discriminatory acts prohibited by the RA include:

329.     Failing to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. 41.51(d); and

330.     Employing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination or that have the purpose or effect of defeating or substantially impairing the objectives of the public entity's program with respect to individuals with disabilities. 28 C.F.R. 41.51(b)(3); and

331.     Failing to make reasonable modifications in policies, practices, or procedures when they are necessary to avoid discrimination on the basis of disability. 28 C.F.R. 41.51(b).

332.     M.R., K.M., M.T., O.J., and C.T., and members of the Restoration Class, qualify as individuals with disabilities as defined under Section 504 because they have, or are regarded as

51

having, mental health disabilities severe enough that their capacity to stand trial has been called into question or they already have been deemed incapable to proceed to trial. 28 C.F.R. 41.31(a).

333.   Defendants have failed to administer mental health services in the most integrated setting appropriate to the needs of Plaintiffs and other Restoration Class members.

334.   Extended confinement of the Restoration Class due to the lack of timely capacity assessment and restoration constitutes unlawful discrimination under the integration mandate of the RA. 28 C.F.R. 41.51(d).

335.   Defendants have utilized methods of administering their mental health services in ways that result in discriminating against the Restoration Class. Defendants' methods of administration defeat, or substantially impair, the benefits of the capacity assessment and restoration programs controlled by DMH.

336.   Defendants have failed to make reasonable modifications to their policies, practices, and procedures necessary to avoid discrimination against the Restoration Class.

337.   Unless enjoined from continuing current unlawful policies and practices, Defendants will continue to violate Plaintiffs' rights outlined in the RA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and others similarly situated, request that this Court:

1.   Adjudge and declare that Defendants' policies, practices, and conduct described in this Complaint violate the rights of individuals who are believed or found to be mentally incompetent to participate in their own defense under the Fourteenth Amendment to the United States Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

2. Preliminarily and permanently enjoin the Defendants, their agents, employees, and all persons under their control from failing to provide timely access to competency assessment and restoration services.

3. Order Defendants to develop a remedial plan to reduce wait times for competency assessments and restoration treatment to within constitutional limits;

4. Award Plaintiffs' costs, including reasonable attorneys' fees under 42 U.S.C. § 1988(b), 42 U.S.C. § 12205, 29 U.S.C. § 794a(b), and 28 U.S.C. § 1920; and

5. Allow such other and further relief as the Court deems just and proper.

Dated: November 24, 2025                    Respectfully submitted,

/s/Amy E. Malinowski
Amy E. Malinowski, #65499
MACARTHUR JUSTICE CENTER
906 Olive Street, Suite 420
St. Louis, MO 63101
Phone: (314) 254-8540
Fax: (314) 254-8547
amy.malinowski@macarthurjustice.org

/s/ Gillian R. Wilcox
Gillian R. Wilcox, #61278
Jason Orr, #56607
American Civil Liberties Union
    of Missouri Foundation
406 West 34th Street, Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9938
Facsimile: (314) 652-3112
gwilcox@alcu-mo.org
jorr@aclu-mo.org

Kristin M. Mulvey, #76060
Jonathan D. Schmid, #74360
American Civil Liberties Union
    of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Phone: (314) 652-3114

Facsimile: (314) 652-3112
kmulvey@aclu-mo.org
jschmid@aclu-mo.org

/s/ Maureen Hanlon
Maureen Hanlon (MBE #70990MO)
Ebony McKeever, #77050MO
ArchCity Defenders
440 N. 4th Street, Suite 390
Saint Louis, MO 63102
855-724-2489 ext. 1008
314-925-1307 (fax)
mhanlon@archcitydefenders.org
emckeever@archcitydefenders.org

/s/ Brent Dulle
Brent Dulle, #59705
Kevin Cowling, #72755
HUSCH BLACKWELL LLP
8001 Forsyth Blvd., Suite 1500
St. Louis, MO 63105
Phone: (314) 480-1500
Fax: (314) 480-1505
Brent.Duelle@huschblackwell.com
Kevin.Cowling@huschblackwell.com