Exhibit 1

Declaration of Lauren Kois, PhD

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| DEBRA DARRINGTON, as next friend for M.R., et al., *on behalf of themselves and others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>MISSOURI DEPARTMENT OF MENTAL HEALTH, et al.,<br><br>Defendants. | ) | Case No. 2:25-cv-04268-MDH |

**DECLARATION OF LAUREN E. KOIS, PhD**

**REGARDING JUNE 2026 SITE VISITS TO FOUR MISSOURI JAILS**

## I. BACKGROUND AND DECLARATION BASIS

1. I am a licensed clinical psychologist who specializes in forensic mental health, particularly competence to stand trial. On March 5, 2026, I submitted an expert declaration in this matter with Drs. Neil Gowensmith and Daniel Murrie. That declaration summarizes my education and professional experience.[1]

2. Plaintiffs' counsel asked me to visit four Missouri jails to observe how individuals found incompetent to stand trial (IST) are held while they wait for inpatient admission. I toured the Jackson County Detention Center in Kansas City on June 8, 2026; the Buchanan County Jail in St. Joseph on June 11, 2026; the St. Louis City Justice Center on June 23, 2026; and the St. Louis County Justice Center in Clayton on June 24, 2026. Counsel for Plaintiffs and counsel for Defendants attended facility tours and class member meetings.

[1] Expert Declaration of Lauren Kois, PhD, Neil Gowensmith, PhD, and Daniel Murrie, PhD, *Darrington v. Missouri Department of Mental Health*, No. 2:25-cv-04268-MDH (W.D. Mo.), ECF No. 63-1 (filed Mar. 9, 2026) ("Kois, Gowensmith & Murrie Decl.").

3. I toured housing units and when permitted, spoke with custody, medical, and mental health staff. Custodial staff conducted the tours at three facilities. At the St. Louis City Justice Center, the Director of Mental Health Services accompanied the tour.

4. The level of detail I could obtain during tours varied by facility. At some facilities the staff member conducting the tour did not know the information I queried about. At others I was not permitted to enter certain areas. During some tours staff declined to answer a question. Where a fact is missing from a facility section below, one of these three is the reason, and I identify which.

5. I met briefly with class members after concluding each tour. Plaintiffs' counsel arranged those meetings, which took place in a private visitation room. The individuals were typically class members identified in earlier filings in this matter. Public defenders attended several of these meetings.

6. I visited these jails as a forensic psychologist observing facility conditions. I did not formally evaluate or treat any detainee. Where I describe an individual's jail, medical, or court records, Plaintiffs' counsel provided those records, and I reviewed most of them after my visits.

## II. COMPONENTS OF ADEQUATE TREATMENT

7. The class members I describe below were court-ordered to competence evaluation or restoration, committed to Missouri's Department of Mental Health (DMH) to receive these services, and detained in local jails. I did not know the diagnosis or clinical background of every individual I met. Records provided to me document serious mental illness (SMI), typically psychotic-spectrum diagnoses. This is the case for most

individuals referred for competence evaluation, found incompetent, and committed for restoration.[2-3]

8. Standard treatment for psychotic illness has several components, which inpatient forensic facilities can provide. I assessed each jail against these components. To begin, the living environment itself should not provoke clinical decompensation. An individualized treatment plan identifies target symptoms and states what will happen if the patient declines treatment. A lawful pathway exists for treating a patient who lacks the capacity to make that decision. Although this is standard practice among inpatient settings, jails very rarely have the resources available to prescribe medication over objection aside from acute incidents with potential for self-harm or harm to others.[4-5] When medication is necessary, a prescriber selects and adjusts an antipsychotic medication. A psychiatric provider sees the patient often enough to assess response, side effects, and change in condition.

9. I asked the same questions at each facility: how individuals with SMI are housed; what mental health services are available, including medication management and psychotherapy; and what jail-based competence restoration (JBCR) programming, if any, is delivered on site. Each facility section below follows the same order: a description of the facility, its mental health resources, restoration programming, the class member or members I met, and a visit summary.

---

[2] Viljoen, J. L., & Zapf, P. A. (2002). Fitness to stand trial evaluations: A comparison of referred and non-referred defendants. *International Journal of Forensic Mental Health, 1*(2), 127–138.

[3] Pirelli, G., Gottdiener, W. H., & Zapf, P. A. (2011). A meta-analytic review of competency to stand trial research. *Psychology, Public Policy, and Law, 17*(1), 1–53.

[4] Felthous, A. R., & Bloom, J. D. (2018). Jail-based competency restoration. *Journal of the American Academy of Psychiatry and the Law, 46*(3), 364–372.

[5] American Academy of Psychiatry and the Law Task Force. (2018). AAPL practice resource for prescribing in corrections. *Journal of the American Academy of Psychiatry and the Law, 46*(2 Suppl.), S1–S50.

## III. JACKSON COUNTY DETENTION CENTER (JUNE 8, 2026)

### A. The Facility

10. Staff reported the Jackson County Detention Center opened approximately one month before my visit. Staff described it as a "justice with dignity" facility. The physical plant was new and clean. Each housing unit has an adjacent outdoor area, including a small garden.

### B. Mental Health Resources

11. Staff reported Freedom Behavioral Health, a contracted provider, delivers most medical care, including psychiatry. They noted the facility has a physician and a psychiatrist. I did not meet the medical director. On-site information was provided by custodial staff only.

12. No staff member described individual or group therapy, individualized treatment planning, or any mental health service other than medication administration and observation.

13. Staff reported the jail's mental health housing (a dedicated “special needs unit”) holds approximately 100 individuals across main tiers of care. They indicated the acute unit is used primarily for suicide risk. Per staff, it also holds individuals in active psychosis "if there's room." Beyond the acute unit, the wing operates step-down stages: stage one for individuals who remain significantly impaired by active SMI, and stage two for individuals moderately to mildly impaired, before their return to general population. Staff reported individuals with dementia are housed on the special needs unit. Additional individuals with stabilized SMI and lower-level mental health needs are housed in general population.

14. I observed the seclusion unit. Staff reported that individuals are placed there for behavioral reasons or as discipline. Every individual on the unit was locked in a single cell. Some wore suicide smocks. No staff member was present on the unit. The staff member conducting the tour reported that custodial staff check the unit on a regular basis.

15. I did not tour the administrative and disciplinary segregation units. A staff member reported individuals who are floridly psychotic are sometimes housed in administrative or disciplinary segregation. I asked what the facility does when an individual with SMI breaks a rule and the behavior is a product of the illness: does he go to disciplinary segregation or to the special needs unit? Staff stated the determination depends on whether the incident was "more mental health, or more disciplinary issue."

**C. Restoration Programming**

16. Staff described a pilot JBCR unit of approximately eight cells. It was built as a juvenile detention unit, and staff indicated it may be returned to that use at some point. Staff reported it was staffed by DMH. Staff were not certain when DMH clinicians are present but estimated "most days." Staff could not tell me how individuals are selected for placement there. The unit looked the same as the jail's other housing units. I did not observe restoration programming on it.

**D. Class Member**

17. I met G.D., a 34-year-old man housed in general population. Staff reported he was receiving an injectable antipsychotic medication. When I approached him, he was using a jail-issued tablet. Staff indicated he spends most of his time on it. He was calm and appeared sedated. He was very unfocused and expressed confusion about his charges. His presentation was consistent with negative symptoms of a psychotic illness. Staff

described him as vulnerable to victimization for that reason. During our conversation he fixated on his jail identification bracelet. He repeatedly tried to show it to me and explain it, and he said he did not know how he had come to have it.

**E. Visit Summary**

18. Staff described tiered mental health housing, an acute unit on which placement for active psychosis depends on bed availability, and a JBCR pilot with capacity for eight individuals. The staff members I spoke with described two mental health service domains: medication administration and observation. None described individual therapy, group therapy, or individualized treatment planning.

19. In carceral settings, SMI symptoms often lead to, or even directly produce, disruptive behavior that result in disciplinary action.[6] Refusing a directive, yelling, banging on a cell door, striking out at staff, and failing to maintain hygiene can each reflect disorganized thinking, paranoia, response to internal stimuli, or an inability to process and follow an instruction. At Jackson County, staff decide whether an individual goes to disciplinary segregation or to the special needs unit by whether the incident seemingly leaned toward symptom-driven behavior or intentional oppositional conduct. Staff may misinterpret such behavior, and symptom-driven and intentional conduct are not mutually exclusive.

20. The appropriate response should be to question whether the individual has a psychiatric illness that may influence behavior of that kind. If so, the next question is how to treat the illness, not how to punish it. Jackson County's response—as is the practice of many carceral facilities—is to place individuals by the nature of the incident rather than by diagnosis, treatment status, or clinical need. In effect, an individual assigned to

---

[6] Clark, K. (2018). The effect of mental illness on segregation following institutional misconduct. *Criminal Justice and Behavior, 45*(9), 1363–1382.

disciplinary housing is moved to a setting with less clinical contact at the time their symptoms cause marked functional impairment. As such, a disciplinary criterion applied to disruptive behavior will tend to route the most symptomatic individuals into the most restrictive housing where symptoms and behaviors typically exacerbate rather than resolve.[7-8]

21. My account of G.D. rests on one conversation and on what staff reported. Staff reported he was receiving an antipsychotic by injection, and that is to the jail's credit. A long-acting injection is the most reliable way to deliver antipsychotic medication to someone who cannot manage a daily regimen, and it was the one component of treatment I could confirm was in place for him.

22. G.D. was still symptomatic. He was slowed and hard to engage, he could not say why he was in jail, and he returned repeatedly to the wristband he could not account for. Those are the residual features of a psychotic illness that medication alone often does not resolve, and they leave a person with less capacity to stay vigilant. He was living in general population, where that capacity is what protects a person. General population is loud, crowded, and unpredictable, and a man who is slowed, confused, and unable to advocate for himself is exposed there. Staff recognized this and said so. Exposure of that kind is a source of stress, and stress is a common precipitant of decompensation in psychotic illness. The medication reduces that risk; the setting raises it. Nothing described to me at Jackson County addressed the setting.

---

[7] Luigi, M., Dellazizzo, L., Giguère, C. E., Goulet, M. H., & Dumais, A. (2020). Shedding light on "the hole": A systematic review and meta-analysis on adverse psychological effects and mortality following solitary confinement in correctional settings. *Frontiers in Psychiatry, 11*, 840.

[8] Martin, D. A., Bailey, C. A., & Gowensmith, W. N. (2023). Ethical considerations of competency restoration: The risk of decompensation in correctional settings. *Psychology, Public Policy, and Law, 29*(1), 62.

## IV. BUCHANAN COUNTY JAIL (JUNE 11, 2026)

### A. The Facility

23. Staff informed me the Buchanan County Jail was built in the 1980s and held around 240 individuals when I visited. Staff described two main housing divisions, both in general population. One holds individuals with no history of incarceration. The other holds individuals who have been incarcerated before.

### B. Mental Health Resources

24. Buchanan has a permanent on-site, master's level, non-prescribing qualified mental health professional (QMHP). TK Health is contracted to provide medical care. Staff reported individuals on DMH's forensic waitlist receive psychiatry assessments once a week over WebEx's telehealth platform.

25. Buchanan does not have a mental health unit. Individuals on suicide precaution or whose psychosis prevents them from sharing a cell are housed in single cells in the booking area.

26. When I visited the infirmary, nursing staff reported no difficulty obtaining medications, including medications not on the jail's formulary. The infirmary also houses the telehealth station. Staff identified it as the location for telepsychiatry appointments and forensic evaluations. The station sits within earshot of the nurses' station, infirmary waiting area, and examination and dental room. Staff and other detainees waiting to be seen can overhear a detainee at that station.

27. Staff indicated no on-site therapy is administered by jail staff. The jail works with Family Guidance, the area's certified community mental health provider. Family Guidance sends mobile staff into the jail to see individuals for therapeutic check-ins.

28. Staff reported DMH historically visited the jail once per month but more recently visited more often. DMH staff reportedly see two to three individuals per visit, with each visit lasting 30 minutes to an hour.

**C. Restoration Programming**

29. Staff reported individuals ordered to restoration are transferred to the Clay County detention facility. When Clay County has no room, they remain at Buchanan. Staff reported a DMH mobile team visits class members awaiting transfer to Clay County or the state hospital once or twice per month.

**D. Class Members**

30. I met B.B., a 23-year-old man. He was small in stature. He showed little emotional expression; spoke softly, usually in incomplete sentences; and appeared confused throughout our conversation. His presentation was consistent with negative SMI symptoms.

31. B.B. reported he had been at this jail for two and a half to three years. He denied any incarceration before this case. He reported he was nonetheless moved to the housing designated for individuals with prior incarceration. He said the move followed an outburst in the presence of a correctional officer. He said he was distressed and having a panic attack during that outburst.

32. K.M., a named Plaintiff, had been in the Buchanan County Jail for roughly 19 months when I visited. His records indicate he was booked into the same jail twice earlier in 2024, and staff recalled those prior contacts. When he arrived this time, staff reported, he "wasn't the same person." At intake he was confused about his charges. Staff described him as hyper-religious and reported he talked to himself constantly, no longer recognized

his sister and insisted she was his niece, and did not recognize his attorney. He declined family visits, which staff attributed to paranoia. Staff also described him as paranoid about technology and about the toilet in his cell, which he would not flush. DMH's competence evaluator diagnosed him with unspecified schizophrenia-spectrum disorder. Buchanan nursing staff twice requested a neurology consultation for diagnostic clarification, although records documented no such consultation.

33. K.M. has been prescribed Risperdal, Zyprexa, and oral Invega. While at Buchanan he has declined virtually all medications, including his blood-pressure, diuretic, and asthma medications. He accepted only Tylenol.

34. Given the jail's limited resources, staff could not offer mental health treatment beyond attempts at medication management and ongoing observation. Staff reported that they had tried to engage K.M. by offering television, time out of his cell, and snacks from the vending machine. Staff reported DMH came every week or two and attempted to engage K.M., although these efforts were unsuccessful.

35. Staff considered K.M. inappropriate for general population, and he had been held in a single cell in the booking area throughout his detention. According to staff, he did not want to leave the cell. When he was taken to the nearby shower, he was cuffed and shackled and escorted by multiple officers, and staff reported that he grew agitated and pulled away from them on the way.

36. Records documented multiple use-of-force events involving K.M., including tasing incidents. He was transported to the emergency room by ambulance after one of those events, in which he sustained head and ear lacerations requiring 10 stitches.

37. When I approached K.M.'s cell, I observed an older, thin, disheveled man sitting on a cot and staring blankly at the cell door. His cell was littered with food wrappers. I attempted to engage him through the cell door. He showed no awareness I was present and continued to stare in silence. When I returned to the booking area later in the tour, I could hear him yelling to himself in his cell.

38. Plaintiffs' counsel informed me DMH admitted K.M. for inpatient treatment in August 2026.

**E. Visit Summary**

39. Buchanan County Jail had no mental health unit. Aside from medication management, mental health resources consisted of an on-site QMHP, mobile staff from Family Guidance, weekly telepsychiatry, and DMH visits every week or two.

40. The telehealth station, used to facilitate telepsychiatry appointments and forensic evaluations, sits in the infirmary within earshot of the nurses' station, the infirmary waiting area, and the examination and dental room. Staff and other detainees waiting to be seen can overhear a detainee at that station. Individuals should be able to discuss their health in a confidential setting, without fear of judgment. An individual who can be overheard may minimize his symptoms to avoid stigma from staff and other detainees, or to avoid appearing ill and vulnerable in a jail. A clinician cannot treat hidden symptoms, resulting in inadequate clinical intervention. The telehealth station is inappropriate for psychiatric appointments or forensic evaluations.

41. B.B. is 23 years old, small in stature, and, per his report, has no prior incarceration history. I did not evaluate B.B., and I offer no diagnosis. He endorsed marked anxiety, and his presentation was consistent with negative symptoms of psychosis.[9-10]

42. B.B. is at the age at which psychotic illness typically emerges. Psychotic illness typically first presents in late adolescence and early adulthood. The years after onset are the period in which treatment can modify the course of the illness.[11-12] Treatment in that period can include medication, individual therapy, family involvement, and supported return to school or work, delivered together by a team. Delivered early, that treatment produces better outcomes than treatment as usual across symptom severity, hospitalization, treatment engagement, and involvement in school or work.[13] The longer the illness goes untreated, the poorer the symptomatic and social outcomes. B.B. has spent the period in which treatment would have had its greatest effect incarcerated, with regular treatment consisting of medication and observation. Each further year without adequate treatment raises the likelihood his symptoms and his functioning will be worse in the long-term.

43. B.B. explained a panic attack prompted his outburst toward staff. The jail subsequently transferred him to housing for individuals with prior incarceration. That move placed him

---

[9] Andreasen, N. C. (1984). *Scale for the Assessment of Negative Symptoms (SANS)*. University of Iowa.

[10] Marder, S. R., & Galderisi, S. (2017). The current conceptualization of negative symptoms in schizophrenia. *World Psychiatry, 16*(1), 14–24.

[11] Howes, O. D., Whitehurst, T., Shatalina, E., Townsend, L., Onwordi, E. C., Mak, T. L. A., Arumuham, A., O'Brien, O., Lobo, M., Vano, L., Zahid, U., Butler, E., & Osugo, M. (2021). The clinical significance of duration of untreated psychosis: An umbrella review and random-effects meta-analysis. *World Psychiatry, 20*(1), 75–95. https://doi.org/10.1002/wps.20822

[12] Petersen, L., Nordentoft, M., Jeppesen, P., Øhlenschlæger, J., Thorup, A., Christensen, T. Ø., ... Jørgensen, P. (2005). Improving 1-year outcome in first-episode psychosis: OPUS trial. *British Journal of Psychiatry, 187*(Suppl. 48), s98–s103.

[13] Puntis, S., Minichino, A., De Crescenzo, F., Harrison, R., Cipriani, A., & Lennox, B. (2020). Specialised early intervention teams for recent-onset psychosis. *Cochrane Database of Systematic Reviews, 2020*(11).

in the harder of the jail's two housing environments and raised his risk of victimization and further deterioration.[14-15]

44. The Prison Rape Elimination Act requires jails and prisons to screen every individual at intake for risk of sexual victimization. The screening must consider, among other factors, whether the individual has a mental disability, their age, their physical build, and whether they have an incarceration history.[16] The standards require the jail to use that screening to inform housing assignments.[17] Federal Bureau of Prisons guidance describes the individuals those factors identify: those who are "small in stature," those whose demeanor is "weak/nonassertive, anxious, depressed," and those with "cognitive limitations."[18] By the criteria the standards require jails to apply, B.B. is an individual at elevated risk of victimization, and the jail responded to his outburst by moving him to housing with more experienced detainees.

45. I did not evaluate K.M. I observed him through his cell door, and he did not respond to me. What I know of his condition comes from staff, from DMH's competence evaluator, and from his records. Those sources describe the same man: confused about his charges, unable to recognize his sister or his attorney, talking to himself, afraid of technology and of the toilet in his cell, and diagnosed with a schizophrenia-spectrum disorder. A condition of that kind requires the treatment described in Section II: antipsychotic

[14] Steiner, B., Ellison, J. M., Butler, H. D., & Cain, C. M. (2017). The impact of inmate and prison characteristics on prisoner victimization. *Trauma, Violence, & Abuse, 18*(1), 17–36.
[15] Blitz, C. L., Wolff, N., & Shi, J. (2008). Physical victimization in prison: The role of mental illness. *International Journal of Law and Psychiatry, 31*(5), 385–393.
[16] 28 C.F.R. § 115.41(d)(1)-(4)
[17] 28 C.F.R. § 115.42(a)
[18] Federal Bureau of Prisons. (2014). *Sexually abusive behavior prevention and intervention program* (Program Statement 5324.11), p. 32.

medication, a clinical response when the medication is declined, clinical contact with a purpose beyond observation, and housing that does not worsen the illness.

46. What K.M. received at Buchanan County was a single cell in the booking area, offers of medication, and observation. He declined the medication and denied staff attempts to engage him. Staff offered television, time out of his cell, and snacks from the vending machine. DMH came every week or two and could not engage him. The jail's response to his symptoms was the response available to a jail in the context of treatment refusal: isolation, restraint, and imminent risk management.

47. Staff described the man who arrived as someone they did not recognize from his earlier bookings. The man I saw roughly 19 months later was sitting on a cot among food wrappers, staring at the cell door, and later yelling to himself. Despite his condition, jail staff had no means to intervene. DMH admitted him for inpatient treatment, where he can receive the treatment he needs in the least restrictive setting.

## V. ST. LOUIS CITY JUSTICE CENTER (JUNE 23, 2026)

### A. The Facility

48. Counsel for the Justice Center attended the tour. Counsel directed that we do not discuss certain subjects or visit certain areas, as noted below. They stated these requests were more appropriately addressed via deposition or court order.

49. Staff described a general population unit, an eight-person segregation unit, and a separate infirmary. The infirmary holds individuals with dementia, hospice-level needs, and heavy psychiatric medication regimens together. Staff also described a classification/detox segregation unit with 48 single cells. Individuals on that unit have 30 minutes out of cell per day and have no commissary, tablets, or kiosk access.

**B. Mental Health Resources**

50. The facility's Director of Mental Health Services, who holds a doctorate in public health, accompanied me throughout the visit. I was not permitted to speak with direct care staff; thus, I did not speak with any licensed clinician during this visit.[19]

51. The Director stated the clinical team manages the full mental health caseload for the jail, reportedly totaling hundreds of detainees. When asked how individuals were identified and placed on that caseload, she reported the clinical team makes these decisions, along with housing placement and intervention plans. I received vague information regarding the clinical team's makeup aside from master's level counselors. I could not identify who holds clinical supervisory responsibility for those decisions. She appeared to be the senior individual responsible for mental health services. I asked how the facility moves individuals between housing units, and into segregation, as they become more symptomatic. She indicated it was a "team decision" before the jail's counsel ended the discussion.

52. The Director reported individuals on the mental health caseload receive "counseling," but I was not provided details about providers, counseling approach, or frequency.

**C. Restoration Programming**

53. The City Justice Center does not have a dedicated JBCR unit. Per staff, DMH clinicians come into the facility to deliver JBCR programming. Staff showed me the multipurpose room where the program meets. It was clean and in good condition. The jail's counsel

[19] Publicly available sources describe the Director's background as epidemiology and behavioral health policy. I searched the Missouri Division of Professional Registration's licensee database on the day of the visit and again as of this writing. Neither search located a clinical license in her name.

prevented staff from sharing information about the program's structure, staffing, or the number of individuals it serves.

**D. Class Members**

54. I asked C.T. how the facility could be made more like a hospital. He answered, "it can never be like a hospital… it's too restrictive." I reviewed his records after the visit. He has been observed "talking gibberish" and smearing feces on the wall of his cell. His records document four deployments of OC spray.

55. M.T. reported he was detained at the Justice Center for approximately two years. He said he is allowed out-of-cell time for approximately two hours per day and does not have access to a tablet. He indicated no groups or organized activities are available to him. He reported he speaks with a psychiatrist "one or month or so" and was took his antipsychotic medication as prescribed. Still, he appeared disoriented, confused, and lacking self-awareness. He said he recently underwent surgery, and when he returned from the hospital, he was placed in segregation instead of the mental health unit.

**E. Visit Summary**

56. Information gathering at the St. Louis City Justice Center was limited relative to the other three facilities. Counsel for the jail closed several subjects and ended the discussion of housing decisions. The Director of Mental Health Services was the only staff member I could speak with, and I did not speak with any licensed clinician. I therefore could not learn how the facility builds its mental health caseload, who holds clinical supervisory responsibility for placement and treatment decisions, what the "counseling" on the caseload consists of, or how individuals are moved between units as they become more

symptomatic. What follows rests on what I saw, on what the two class members reported, and on C.T.'s records.

57. Staff reported that JBCR at the City Justice Center is delivered by DMH clinicians who come into the jail and use a multipurpose room, which was clean and in good condition when I saw it. There is no dedicated unit. I could learn nothing further. When I asked about the program's structure, staffing, and the number of individuals it serves, the jail's counsel instructed staff not to answer.

58. C.T.'s records describe him "talking gibberish" and smearing feces on his cell wall. Disorganized speech and disorganized behavior of that kind are features of active psychosis. The same records document four deployments of OC spray. The documented response to a symptomatic individual was chemical restraint. Nothing in the records I reviewed, and nothing I was permitted to ask, described a clinical response to the same behavior.

59. M.T. reported he takes his antipsychotic medication as prescribed and speaks with a psychiatrist about once a month. He was nonetheless disoriented, confused, and lacking self-awareness when I met him. An individual who is adherent to medication and still symptomatic requires more frequent psychiatric review, not less. M.T. reported roughly two hours out of cell per day, no tablet, and no groups or organized activities. He reported that when he returned from the hospital after surgery, he was placed in segregation rather than on the mental health unit.

## VI. ST. LOUIS COUNTY JUSTICE CENTER (JUNE 24, 2026)

### A. The Facility

60. The St. Louis County Justice Center's rated capacity is approximately 1,200 detainees. Staff reported it operated at that capacity the day of our visit. General population units have capacity for 70-80 detainees. Individuals housed on these units have recreation space and vending machine access.

61. St. Louis County's Department of Public Health's Corrections Medicine program provides medical and mental health services. In the weeks before my visit, the county's Director of Public Health publicly warned that funding for 23 contracted nursing and medical positions at the jail would lapse on June 30, 2026, and that Corrections Medicine would shift to crisis-level operations, including once-daily medication passes and suspension of sick calls, opioid treatment, and chronic disease management.[20] The County Council appropriated the funds at an emergency meeting on June 24, 2026, the day of my visit.[21]

62. The jail's medical unit had room for 20 to 30 individuals, a padded cell, and three isolation cells. Individuals with dementia are placed in an eight-person "dorm" off the medical unit. Individuals on the medical unit have tablets.

63. Staff said administrative and disciplinary segregation were located on the same unit, separated by tier. Staff reported they "try not to hold" individuals in administrative segregation for more than ten days. Individuals in segregation have no programming.

---

[20]Davis, C. (2026, June 17). St. Louis County jail funding delayed, county executive says jail is headed toward medical emergency. *St. Louis Public Radio*. https://www.stlpr.org/government-politics-issues/2026-06-17/st-louis-county-jail-funding-delayed-county-executive-says-jail-headed-toward-medical-emergency

[21]Wimbley, L. (2026, June 24). St. Louis County Council approves $3M for essential medical staff at jail after contentious delays. *St. Louis Public Radio*. https://www.stlpr.org/government-politics-issues/2026-06-24/st-louis-council-approves-3-million-for-essential-medical-staff-jail-after-contentious-delays

They get 30 minutes a day out of cell in a "bubble" and recreate alone. They have no commissary, tablets, or kiosk access. They are allowed video visits, but in-person visits are not permitted.

**B. Mental Health Resources**

64. Staff reported approximately half of the medical unit is reserved for mental health placements. A clinician is always present.

65. The jail's mental health unit was identical to the general units, with room for 70-80 detainees. Psychiatry staff visit the mental health unit three days per week. Individuals placed in segregation and with special-needs status see a nurse every day.

66. Staff reported single-cell placement is treated as an emergency measure and the medical and mental health team, rather than custody staff, makes those placement decisions.

67. Groups offered in general population include GED, college, and employment preparation.

**C. Restoration Programming**

68. Staff told me DMH staff deliver JBCR on an individual basis, never in groups. Staff did not know how often DMH clinicians visit or how class members are selected for JBCR enrollment. I have no other information about its structure, staffing, or the number of individuals it serves.

**D. Class Members**

69. I attempted to meet E.S., approximately 20 years old. Her public defender was present and described E.S. as delusional and paranoid. For example, E.S.'s attorney reported that E.S. would not meet with her because she did not believe the attorney was her lawyer; when I attempted to meet E.S. with her public defender present, she stated, "That's not my lawyer," and asked to leave.

70. I also met D.W., a named Plaintiff, housed in the administrative/disciplinary segregation unit. D.W. and I met for approximately twenty minutes. A glass partition with a narrow pass-through slot separated us. D.W. was wearing a suicide smock. I asked what he was wearing beneath it. He told me he had nothing on beneath it. He told me he had been in the smock for approximately one month. Later, Plaintiffs' counsel informed me he had worn the smock during all the interactions, dating back to October 2025.

71. D.W.'s DMH evaluator had described him as disheveled and unkempt. This was also his presentation during our interaction. His emotional expression was flat and his gaze was blank. He offered no spontaneous speech, and he was confused enough that I had to use very simple sentences for him to follow my questions and answer them. He reported that he heard voices others did not hear but drifted off when I asked if he could describe them. He had evidently not attended to his personal hygiene. His body odor was strong enough to reach my side of the visiting room through the glass partition and the small pass-through slot.

72. The DMH evaluator had opined D.W. was not appropriate for the jail-based competency restoration program due to his noncompliance with psychotropic medication and lack of insight into his current psychiatric symptoms. Per the report, psychiatry staff opined D.W. did not reach the threshold for involuntary medications based upon a danger to himself, others, or grave disability. D.W. was therefore too symptomatic to participate in JBCR but not symptomatic enough for involuntary medication.

73. The "lock status" field in D.W.'s nursing assessments alternates between "disciplinary lockdown" and "ADSEG" from one day to the next. His records documented disciplinary sanctions for failure to maintain personal hygiene by urinating on his cell floor.

Additional sanctions were for excessive use of his cell's call button (on one occasion requesting to be transferred to intake, and another to ask an officer the time). Another occurred when D.W. was showering and would not return to his cell for lock down. Sanctions resulted in forfeiture of out-of-cell time—when detainees are permitted to shower. Thus, sanctions imposed for failing to maintain personal hygiene withdrew his access to a shower.

**E. Visit Summary**

74. The St. Louis County Justice Center operates the only mental health unit I observed at the four facilities that resembles a treatment setting. Both class members I met there had been housed in disciplinary segregation.

75. E.S. is approximately 20 years old. I did not evaluate her and offer no diagnosis. The considerations I set out above regarding B.B.'s age apply to her. She is at the age at which psychotic illness typically emerges. The interval between onset and effective treatment is among the few modifiable predictors of long-term outcome. If her account of the restoration list is accurate, an individual who becomes more ill while waiting is moved further from treatment.

76. D.W.'s records describe D.W.'s setting interchangeably as disciplinary lockdown and administrative segregation. The distinction between disciplinary lockdown and administrative segregation is administrative rather than substantive. An individual held naked beneath a suicide smock, unwashed, in a segregation cell is not being managed appropriately. Personal hygiene is among the last functions a person maintains and among the first to be lost in untreated psychosis. Its loss is a marker of deterioration and a cause of further deterioration. It carries direct medical risk. It makes ordinary human

contact aversive to staff and to other detainees. That deepens the isolation of an individual who is already withdrawn.

77. An individual in a condition such as D.W.'s requires psychiatric intervention and frequent review to track clinical response, not reduced interpersonal contact and restricted privileges. He requires a setting in which hygiene and safety are maintained for him.

## VII. CONCLUSION

78. I asked the same questions at each of the four jails: how individuals with SMI are housed, what mental health services are available, and what JBCR is delivered on site. I did not evaluate any individual I met, and I offer no diagnosis. Where I describe records, Plaintiffs' counsel provided them. At the St. Louis City Justice Center, counsel for the jail limited what staff could tell me. The findings below therefore describe Jackson County, Buchanan County, and St. Louis County unless I state otherwise.

79. The class members I met were committed to DMH to receive competence evaluation or restoration in a hospital. They were held in jails instead. A hospital is built and staffed to treat psychotic illness, which is why it can provide the components described in Section II. A jail is built to detain. Its housing, staffing, and rules follow from that purpose.

80. Three of the four facilities had no unit capable of adequately treating marked psychosis. At Jackson County, placement of an individual in active psychosis on the acute unit depends on whether there is room. Buchanan County has no mental health unit. Individuals whose psychosis prevents them from sharing a cell are held in single cells in the booking area, where K.M. spent roughly 19 months. St. Louis County has a mental health unit with a clinician present, and D.W. was housed in segregation. I could not

learn how the St. Louis City Justice Center houses individuals as they become more symptomatic.

81. No staff member at any facility described an individualized treatment plan. Staff at Jackson County described two services: medication administration and observation. Staff at Buchanan County described those two services plus an on-site QMHP, weekly telepsychiatry, and check-ins from Family Guidance. At St. Louis County, the medical and mental health team decides single-cell placement, and psychiatry staff visit the mental health unit three days a week. At the City Justice Center, the Director reported "counseling," and I was not given its providers, approach, or frequency.

82. As stated in Section II, jails rarely have the means to medicate over objection outside an acute emergency. Indeed, K.M. declined nearly all medication for roughly 19 months, and the jail's response was a single cell, offers of medication, and observation. D.W. was found too symptomatic for JBCR because he declined medication and lacked insight, and not symptomatic enough for involuntary medication. No facility described what happens next for an individual in that position. A hospital has a lawful pathway for that individual. A jail usually does not.

83. Medication was the one component I could confirm. G.D. was receiving an injectable antipsychotic. That component depends on the individual accepting it, and K.M. and D.W. did not. Psychiatric contact varied. Buchanan County provides weekly telepsychiatry at a station where staff and other detainees can overhear the appointment. St. Louis County's psychiatry staff visit the mental health unit three days a week; an individual in segregation sees a nurse. Jackson County has a psychiatrist through its contracted provider, and I did

not learn how often that psychiatrist sees patients. I could not learn the City Justice Center's arrangement.

84. At the three facilities where I could learn how housing decisions are made, the decision turns on the character of the incident rather than on the illness that produced it. Jackson County staff choose between disciplinary segregation and the special needs unit by whether an incident was "more mental health, or more disciplinary issue." Buchanan County moved B.B. to housing for individuals with prior incarceration after an outburst he attributed to a panic attack. St. Louis County sanctioned D.W. for urinating on his cell floor and for pressing his call button, and the sanction removed his out-of-cell time and with it his access to a shower. In each case the jail answered a symptom with a sanction or a move to more restrictive housing.[22] Records also document tasing of K.M. and OC-spray deployments involving C.T. Restrictive housing and physical restraint are associated with further decompensation among individuals with SMI, not with stabilization.

85. The same individuals are at elevated risk of victimization. The Prison Rape Elimination Act standards require jails to screen for that risk using, among other factors, mental disability, age, physical build, and incarceration history, and to use the screening in housing assignments.[23] Individuals with SMI are victimized in custody at higher rates than other detainees.[24] B.B. is 23, small in stature, anxious, and by his account never incarcerated before. He meets each of those risk factors, and the jail moved him toward more

[22] Clark, K. (2018). The effect of mental illness on segregation following institutional misconduct. Criminal Justice and Behavior, 45(9), 1363–1382.

[23] 28 C.F.R. §§ 115.41(d)(1)–(4), 115.42(a).

[24] Blitz, C. L., Wolff, N., & Shi, J. (2008). Physical victimization in prison: The role of mental illness. International Journal of Law and Psychiatry, 31(5), 385–393; Steiner, B., Ellison, J. M., Butler, H. D., & Cain, C. M. (2017). The impact of inmate and prison characteristics on prisoner victimization. Trauma, Violence, & Abuse, 18(1), 17–36.

experienced detainees. G.D. was slowed, confused, and unable to say why he was in jail, and he lived in general population. Jackson County staff described him as vulnerable for that reason. Nothing described to me at either facility addressed the setting.

86. I did not observe JBCR delivered at any of the four facilities. Jackson County's pilot unit looked the same as the jail's other housing units, and staff could not say how individuals are selected for it. Buchanan County has no restoration on site. At the St. Louis City Justice Center, counsel for the jail directed that we do not discuss the program. At the St. Louis County Justice Center, staff did not know how often DMH clinicians come. I could not determine from these visits what JBCR consists of at these facilities or who receives it.

87. Longer duration of untreated psychosis predicts more severe and persistent symptoms, poorer functioning, and lower likelihood of remission.[25] Cognitive impairment and symptom severity, in turn, predict poorer competency restoration outcomes.[26] B.B. and E.S. are at the age at which psychotic illness typically emerges, and the years after onset are the period in which treatment changes its course.[27] K.M. spent roughly 19 months declining treatment in a booking cell. D.W. was in a suicide smock, unwashed, reporting voices, in segregation. I did not evaluate any of them. The research predicts that individuals

---

[25] Howes, O. D., Whitehurst, T., Shatalina, E., Townsend, L., Onwordi, E. C., Mak, T. L. A., Arumuham, A., O'Brien, O., Lobo, M., Vano, L., Zahid, U., Butler, E., & Osugo, M. (2021). The clinical significance of duration of untreated psychosis: An umbrella review and random-effects meta-analysis. World Psychiatry, 20(1), 75–95; Biswas, J., Drogin, E. Y., & Gutheil, T. G. (2018). Treatment delayed is treatment denied. Journal of the American Academy of Psychiatry and the Law, 46(4), 447–453.

[26] Staats, M. L. P., Kivisto, A. J., & Connell, R. E. (2021). The role of cognitive functioning in predicting restoration among criminal defendants committed for inpatient restoration of competence to stand trial. International Journal of Law and Psychiatry, 74, 101654; Toofanian Ross, P., Padula, C. B., Nitch, S. R., & Kinney, D. I. (2015). Cognition and competency restoration: Using the RBANS to predict length of stay for patients deemed incompetent to stand trial. The Clinical Neuropsychologist, 29(1), 150–165.

[27] Puntis, S., Minichino, A., De Crescenzo, F., Harrison, R., Cipriani, A., & Lennox, B. (2020). Specialised early intervention teams for recent-onset psychosis. Cochrane Database of Systematic Reviews, 2020(11), CD013288.

held this way arrive at restoration more ill and more difficult to restore than when they were found incompetent.

88. Jails are not hospitals. They were not built to be, and none of the four jails I visited had the housing, staffing, or lawful means to treat active psychosis. I do not attribute this to any individual officer, nurse, or clinician. Several of the staff I met, such as the Buchanan staff attempting to engage K.M., made evident efforts within facilities not built or staffed for this population. An individual with SMI who is at risk of victimization and decompensation requires a therapeutic environment with sufficient mental health resources: a setting where housing follows clinical need, treatment follows a plan, a lawful pathway exists when treatment is declined, and a prescriber sees the patient often enough to adjust it. The class members I met were awaiting that level of care.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on September 15, 2026, in Charlottesville, Virginia.

Lauren Kois, PhD

______________________

Lauren E. Kois, PhD

Clinical and Forensic Psychologist